No. 26,984.

THE CITY OF McPHERSON, *Appellant*, v H. M. STUCKER, N. E. STUCKER and N. E. STRACHAN, doing business under the name of STUCKER, STUCKER & STRACHAN, and THE FIDELITY & DEPOSIT COMPANY OF MARYLAND, *Appellees*.

SYLLABUS BY THE COURT.

1. BUILDING AND CONSTRUCTION CONTRACTS—*Guaranty of Structure*. The provisions of a contract to waterproof a water tower considered and held to guarantee a water-tight structure.

2. TRIAL—*Demurrer to Evidence—Hearing and Determination*. Rule followed that in considering a demurrer to the evidence the court must consider as true every portion which tends to prove the case of the party resisting the demurrer.

Appeal from McPherson district court; WILLIAM G. FAIRCHILD, judge. Opinion filed February 12, 1927. Reversed.

*Gus Nyquist, Frank O. Johnson,* both of McPherson, and *Bert Steeper,* of Kansas City, Mo., for the appellant.

*C. A. Smart,* of Lawrence, *P. J. Galle* and *James L. Galle,* both of McPherson, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for damages for failure of the defendants to waterproof a concrete standpipe erected by them under contract with the plaintiff. A demurrer to plaintiff's evidence was sustained and plaintiff appeals.

The facts are substantially these:

Sometime prior to July, 1921, the city of McPherson decided to build a water tower, 110 feet high and 36 feet in diameter. It employed engineers who prepared plans and specifications which were complete except in the matter of waterproofing the tower. The specifications contained this paragraph:

"It is intended to allow any one of several methods of waterproofing to be used, provided that it is approved by the engineer and has demonstrated its value by a similar use elsewhere. Full specifications as to method of waterproofing shall be submitted with the bid, which shall include the weight per square foot or yard of fabric and bituminous material to be used."

Defendants Stucker, Stucker and Strachan presented a bid including a statement that:

Building and Construction Contracts, 9 C. J. pp. 745 n. 61, 746 n. 62; 6 R. C. L. 866. Trial, 38 Cyc. pp. 1543 n. 69, 1548 n. 23; 26 R. C. L. 1062.

"If Ferro-tite Waterproofing is used, deduct $700. If new Billett Steel is used, add $700."

The Stucker bid was accepted with the qualification that the city would investigate this particular kind of waterproofing. Its engineers examined into the merits of Ferro-tite and the city decided to use it. Specifications of the waterproofing were furnished, accepted and the work proceeded. When it was completed, the tank was filled and found to leak. After more work had been done toward waterproofing it with Ferro-tite, the leak was greatly reduced, but not entirely stopped. Demands were made upon defendants to make the standpipe water-tight, but were not complied with. Afterwards the defendants notified the city that they could not make the tank water-tight with their method, and advised the city to take over the work. The job was then let to another contractor who completed it.

The city sought to recover damages and defendants counterclaimed. The controlling question is whether defendants guaranteed against defects of material and construction only or a water-tight tank. Defendants argue that if there was no defect in the materials furnished nor workmanship, that they were not liable for failure to produce the result of a water-tight tank. Pertinent portions of the plans and specifications follow [*italics ours*]:

"3. SCOPE OF CONTRACT. This contract is to cover furnishing all labor and material to build the tank complete, including the construction of a valve manhole; to install the special valves furnished by the city; and provide the water and drain connections shown on the plans. The contract will also cover all other work, plant and equipment, which may be either directly or indirectly necessary for the satisfactory completion of the work, and the removal of all scaffolding, surplus materials, rubbish, or other obstructions caused or created by the operations of the contractor.

"58. Special care shall be used to secure the proper amount of water to produce a dense water-tight concrete.

"64. The concrete in the wall shall be placed in one continuous run and *must be absolutely water-tight*. The joint between the footing and the wall shall be made water-tight by a groove and a metal dam, and the same construction shall be used if through unforeseen circumstances a joint must be left elsewhere. If such joint must be left in the wall, any procedure which the engineers may deem necessary shall be followed to insure a *water-tight wall* at the joint.

"70. WATERPROOFING. The tank shall be waterproofed by applying a continuous bituminous membrane to the floor and the lower 55 feet of the wall and by applying a mop coat of hot asphalt to the upper 55 feet. The membrane shall be protected by an inner lining.

City of McPherson v. Stucker.

"71. BITUMINOUS MEMBRANE. The membrane shall be felt or fabric imbedded in a bituminous cement. All materials shall be of the highest quality suitable for the work and tested by previous similar use. The fabric shall be felt, cotton fabric. The bituminous shall preferably be a pure asphalt, and shall be soluble to not less than 98 per cent in cold carbon bisulphide. It shall be of the proper consistency and it is especially important that the material shall be ductile at temperatures down to 32 D. F. Full specifications and references to previous use shall be submitted for all waterproofing materials at the time of the bid. All such materials shall be delivered on the job in their original branded packages, and statements as to manufacturers' tests shall be submitted. It is intended to allow any one of several different methods of waterproofing to be used, provided that it is approved by the engineer, and has demonstrated its value by similar use elsewhere. Full specifications as to method of waterproofing shall be submitted with the bid, which shall include the weight per square foot or yard of fabric and bituminous material to be used.

"72. The concrete surface shall be clean and dry before the waterproofing is applied, and no waterproofing shall be done in wet weather or when the temperature is below 32 D. F. Only men experienced in the application of this class of material shall be used. To the clean dry wall shall be applied one or two coats of a suitable primer. A mop coat of hot bituminous material shall then be applied, and to this shall be cemented while hot the first layer of felt or fabric. This shall be immediately mopped with hot bituminous and the additional layers then applied, cementing each layer and finishing with a heavy mop coat of bituminous material. The layers of fabric must be properly lapped or 'shingled.' The alternate materials to be used will be: (a) Two (2) plies of heavy cotton drill fabric; (b) four (4) plies of wool felt; (c) four (4) plies of asbestos felt combined with one (1) ply of burlap or cotton fabric. Where felt and fabric are used in combination, the fabric must be given a sufficient lap to develop its strength. The joint at the top of the membrane shall be carefully calked with oakum or felt.

"73. MOP COAT. Above the membrane the concrete shall be protected by a mop of bituminous material. One or two coats of primer shall be applied as specified for the membrane waterproofing. Over this shall be mopped two coats of hot bituminous material of a suitable quality and ductility.

"74. LINING. After the waterproofing is in place, it shall be protected by a lining, which shall be a wall of hard burned No. 1 common brick one course thick; a poured concrete wall, four inches (4 in.) thick, and reinforced with a wire mesh weighing not less than 45 pounds per 100 square feet; or a two and one-half inch slab of 'gunite' with reinforcing as specified for the poured wall. Extreme care shall be used not to damage the waterproofing, and any damage done shall be immediately repaired. There shall be a mortar joint not less than one-half inch thick between the waterproofing and the brick wall. No construction methods may be used which tend to damage the waterproofing or prevent inspection immediately before it is covered up by the lining.

"99. GUARANTEE. The contractor shall guarantee the work aginst any defects of material or construction for a period of one year from the date of

acceptance, as hereinafter provided in the contract. *The tank shall be water-tight when completed* and shall not during the year show any leaks attributable to defects in material or workmanship.

"104. *The contractor shall have charge of and be responsible for the entire improvement for which construction he has contracted until its completion and acceptance.* He shall ·also be held liable for any defects of material or workmanship, or both, which may appear within one year following the completion of the work.

"114. BONDS TO BE EXECUTED. The contractor agrees to execute a bond in the sum of sixty-five (65) per cent of the contract, with such sureties as shall be approved by the city, running to the city as a guarantee (*a*) *for the completion of the work* in strict accordance with the detailed plans, specifications and contracts; or any improper materials used in its construction, or by or on account of any act or omission of the said contractor or of the contractor's agent or agents.

"122. ABANDONMENT, ASSIGNMENT AND LOSS OF CONTROL OF CONTRACT. *It is further agreed by the contractor that if the work to be done under this contract shall be abandoned,* or if it shall be assigned so that the contractor loses control of the work; or if the rate of progress is not such as to insure its completion within the time specified . . . The cost of doing such work shall be charged to said contractor and the expense so charged shall be deducted and paid by the city out of such money as may be due, or that any time thereafter may become due the contractor, under and by virtue of this contract or any part thereof."

There was evidence that "at the time the bid was· opened, the defendants stated that this waterproofing (Ferro-tite) was proper for this kind of a job—would be satisfactory. . . ."

"A. They were to make it water-tight.

"Q. What is that?  A. Make it water-tight.

"Q. They said that?  A. Yes, sir.

"Q. Which one of them?  A. I couldn't say. That has been a long time ago.

"Q. They were both present?  A. They were both present, Stucker and Strachan.

"Q. It was said in their presence or their hearing, of the Stuckers?  A. It was before the commission.

"Q. Before the commission?  A. Yes, sir.

"Q. All three commissioners were there?  A. Yes, sir.

"Q. And Mr. Learned was there?  A. Yes, sir.

"Q. What more did they say about what Ferro-tite would do?  A. Make it water-tight."

Another witness testified substantially that the Ferro-tite people came to make it water-tight, and announced December, 1921, that they had it completed. The tank was filled with water about the first part of January, 1922. After it was filled it was found not to

be water-tight; water came out of it all around clear down to the ground. The Ferro-tite people did some more work in the spring of the following year and put on a second application. After the second application had been put on they filled the tank. It still leaked. In the following fall they came back, went inside and put on burlap strips. It was filled with water again but still leaked. The Ferro-tite people did no more work on it. On January 3, 1923, at a meeting of the city commissioners, the Ferro-tite people were present. All parties were notified. The Contract Waterproofing Company and the defendants Stucker, Stucker and Strachan were present. The Ferro-tite people were present by their attorney, who stated that the expansion was too great, that their process would not hold and put the blame on the tank. The Ferro-tite people did no further work. Plaintiff notified them they must do something immediately or it would, so plaintiff advertised for new bids and let contracts to the Johns-Manville Company and to Gus Webb. Witness identified certain exhibits, the bids of the H. W. Johns-Manville Company and Gus Webb which were offered in evidence and refused by the court "on the ground that they were incompetent as there is no guarantee on the part of the contractor that the standpipe would be water-tight; their guarantee simply going to the material and workmanship."

Another witness testified that he recalled the meeting of January 3, 1923; that he remembered the Ferro-tite people having stated they could not waterproof the tank with their process and was satisfied from that date that the waterproofing company could not make the water tank water-tight by that process. Another witness testified that the defendants did not want to go ahead and finish the standpipe, and suggested to the plaintiff that it take the proposition over because if the contractors (defendants) went ahead they were afraid it would create a liability on their part and they did not care to pay the Contract Waterproofing Company for a job it had never completed and that had not been made good; that Stucker said he believed the Contract Waterproofing Company had done all it knew how in respect to waterproofing this tank, and it would be better for the city to complete the waterproofing and pay for it out of the balance of the money that was retained on their contract and that they (defendants) had not paid the Contract Waterproofing Company any money on their contract, and did not intend to until they had waterproofed the tank; that no demand has been made on the

city to pay the balance held by the city on the Stucker contract to the defendants when contract was completed, nor has any bill ever been presented or rendered by defendants to the city.

Considerable evidence was erroneously excluded, but enough was received to show that defendants themselves expected to make the tank water-tight. We are of opinion that the terms of the written contract were sufficiently clear to show that it was the intention of the parties to obtain a definite result; that the waterproofing should make the tank water-tight. The contract provided that such a result was to be obtained by using the method outlined in the specifications or any one of several different methods of waterproofing to be approved by the engineer and the specifications furnished by the contractor. When the principal object of a contract is to obtain a result, there has been no compliance with the contract until the result has been obtained.

"Where the contract contains a guarantee or warranty, express or implied, that the builder's work will be sufficient for a particular purpose, or to accomplish a certain result, unless waived by the owner, the risk of accomplishing such purpose or result is on the builder and there is no substantial performance until the work is sufficient for such purpose or accomplishes such result.". (9 C. J. 745.)

There was evidence showing the efforts of the defendants to comply with the provisions of the contract to make it water-tight, of their failure so to do and their suggestion to the city that it take over the job and complete it, and there was evidence of plaintiff's damage and performance of all requisites entitling it to recover. Under the circumstances, it was error to sustain a demurrer to plaintiff's evidence. (*Rowan v. Rosenthal,* 113 Kan. 604, 215 Pac. 1008; *Prewitt v. Sholl,* 120 Kan. 158, 242 Pac. 149; *Lindenbaum v. Kamen,* post, p. 775.)

The defendants in several ways question plaintiff's right of review. It is contended that while plaintiff filed a motion for new trial and while one of its specifications of error is the overruling of the motion for new trial, the motion was not brought up and the notice of appeal did not specify the overruling of the motion for new trial as a basis of appeal. It is also contended that this court cannot review error based upon the exclusion of evidence because plaintiff produced no evidence on the hearing of the motion for a new trial. The various contentions are not controlling. The rule invoked (R. S. 60-3004) with reference to excluded evidence does not

apply where the evidence is documentary because the trial court is already informed as to the character and admissibility as fully as it could be by affidavit or oral testimony. (*Winkler v. Korzusz-kiewicz,* 118 Kan. 470, 235 Pac. 1054. See, also, *Treiber v. McCormack,* 90 Kan. 675, 163 Pac. 268; *Bank v. Seaunier,* 104 Kan. 7, 178 Pac. 239.) Error predicated on the exclusion of evidence where there has been no verdict, report or decision but where the case comes to this court on an appeal from an order sustaining a demurrer to the evidence, is reviewable. (*Wagner v. Railway* Co., 73 Kan. 283, 85 Pac. 299; *State Bank v. McBride,* 115 Kan. 51, 222 Pac. 141.)

It appears unnecessary to discuss other questions raised in the briefs.

The judgment is reversed and the cause remanded for a new trial.