365 P.2d 448

Jesse G. LOPEZ, Plaintiff-Appellant,

v.

Robert HEESEN and Sears, Roebuck and Company, a corporation, Defendants-

Appellees.

No. 6760.

Supreme Court of New Mexico.

Aug. 22, 1961.

Rehearing Denied Oct. 31, 1961.

Smith, Kiker & Kitts, and Ramon Lopez, Albuquerque, for appellant.

Sutin & Jones, Albuquerque, David R. Hardy, Kansas City, Mo., for appellees.

CHAVEZ, Justice.

Appellant, Jesse G. Lopez, originally filed suit against appellee, Robert Heesen, alleging that on October 15, 1958, Heesen unlawfully, violently, maliciously and feloniously assaulted and shot appellant with a shotgun, thereby inflicting dangerous and painful wounds and injuries to appellant, causing him great bodily and mental pain and anguish, all to his damage in the total sum of $80,000, which included $25,000 punitive damages.

Appellee, Heesen, answered denying the allegations of the complaint and thereafter appellant filed a demand for jury trial. By stipulation of appellant and appellee, Heesen, appellee, Sears, Roebuck and Company was joined as a party-defendant. Appellee, Sears, Roebuck and Company, will hereinafter be referred to as appellee "Sears." Thereafter two amended complaints followed before the third amended complaint was filed, alleging that appellee, Sears, was engaged in the design and manufacture of hunting firearms, including the Higgins Model 51, Cal. 30.06 rifle, and was also engaged in the selling of firearms in Albuquerque.

It was also alleged that on October 14, 1958, appellee, Sears, sold to appellee, Heesen, one of said Higgins Model 51 hunting rifles; that said rifle was negligently designed or manufactured by appellee, Sears, in that the safety mechanism moved readily and in a dangerous manner from a "safe" to a "fire" position. In addition, it was alleged that the rifle in this dangerous condition known to appellee, Sears, was sold to appellee, Heesen, with the knowledge that it would be used for hunting purposes and that appellee, Sears, negligently failed to warn appellee, Heesen, of the dangerous and defective condition of the rifle.

The complaint further alleged that on the afternoon of October 15, 1958, in Colfax County, New Mexico, appellee, Heesen, negligently permitted the rifle to discharge while hunting and that as a proximate result of the joint and concurrent negligence of both appellees, appellant sustained a severe and disabling wound and injury to his chest, requiring hospital and surgical care. Appellant demanded damages in the amount of $55,000 against both appellees, jointly and severally.

Appellee, Heesen, answered denying the allegations of the third amended complaint. Appellee, Sears, also answered denying the allegations and raising additional affirmative defenses, to-wit: That appellant's injuries were caused by an unavoidable accident; that the negligence of appellee, Heesen, was the sole cause thereof; that the rifle involved was of a recognized quality and of proper design and functioned

properly by all commercial sporting arms standards when used with reasonable care; that rifles of this type had been manufactured by the millions and used by hunters generally and by the government of the United States and foreign countries; that the safety mechanism and its qualities were patent and obvious, and had been seen and inspected by Heesen prior to the accident; that Heesen knew of the tendency of the safety mechanism to come off safety to "fire" position while hunting in heavy brush and climbing up and down mountain terrain when pressure was applied to the safety mechanism; that appellee, Sears, had no duty to warn appellee, Heesen, of the method of operation and use of the safety mechanism; and that it could not have been foreseen that appellee, Heesen, would continue to hunt in heavy brush and mountainous terrain knowing that the safety mechanism would come off safety without taking proper precautions to handle the rifle in a reasonable manner.

The jury returned its verdict finding the issues for both appellees and against appellant. Judgment was entered for appellees and this appeal followed. Appellant abandoned any contention that the verdict in favor of Heesen was erroneous and this appeal concerns only appellee, Sears.

The facts are substantially as follows. In the early afternoon of October 14, 1958, appellee, Heesen, an Air Force officer, purchased a J. C. Higgins Model 51, 30.06 rifle from the store of appellee, Sears. Said rifle has a bolt action known more particularly as a "Mauser type action" with which Heesen was familar. Heesen, although experienced in hunting, was not familiar with the Higgins Model 51 and had never used such a rifle. The safety mechanism on the rifle is what is known as a "Class 1" safety, meaning that it interrupts the firing pin directly. The safety lever is mounted on the left side of the gun to the rear of the bolt assembly. It is a two-position safety with the action locked when the safety lever is in a raised position. To release the safety, you push the safety lever to the left and down to a horizontal position and the gun is then ready to fire.

Heesen first telephoned appellee's store about obtaining a Higgins rifle which they advertised. Later he went to appellee's store and purchased the rifle. At the time of the purchase Heesen was given an instruction pamphlet which he read. Said pamphlet explained the composition of the rifle and gave operating instructions, including the method to be pursued to make the gun "safe," i. e., how the gun is put in a safety position and how it may be released and have the gun ready to fire. It appears that Heesen first talked to a salesman, John C. Villella, over the telephone and requested that the rifle be put aside for him. However, another salesman, Roger Perkins made the actual transfer of the rifle to Heesen.

Perkins' whereabouts is unknown and nothing is known as to Perkins' conversation with Heesen. Villella did not give Heesen any instructions as to the use of the safety mechanism. There was a telescopic sight advertised for sale for use with this rifle but Heesen did not care for the sight and did not purchase it.

Immediately after the purchase of the rifle, Heesen left for a deer hunting trip in an area known as Ute Park near the town of Eagle Nest in Colfax County. He arrived at Ute Park that night and began hunting the next morning on October 15, 1958. Heesen hunted without success and had seen no game up until the time his gun discharged and appellant was wounded shortly after 3:00 P.M.

When Heesen commenced hunting that morning he placed a live cartridge in the chamber and placed the gun on safety position. He traveled a good deal during the hours before the shooting and on one or two occasions he discovered the gun off safety position. This was when he had come down a long hill covered with rocks and boulders and he assumed that he had hit it against a rock or something. Thereafter Heesen checked the safety position on frequent occasions. Heesen carried the gun on his right shoulder with the sling at port arms or ready position, with his left hand on the forearm of the gun and his right hand on the stock, and by the forearm of the gun with his right hand at the "balance" of the rifle. In each of these positions the safety lever was toward Heesen's body or right leg. Heesen changed the position in which he carried the rifle during the course of his walking up and down mountain slopes. He also carried it in a different position in going through brush and in climbing or stepping upon rocks. Although the gun moved from "safe" to "fire" position at least twice during the hours before the shooting, Heesen was not aware of this occurrence. Shortly before the shooting, Heesen had been sitting on a knoll for about twenty minutes checking the wind and watching for deer. While sitting on the knoll he checked or observed the safety lever on the rifle several times and it was on safety position. At a time not more than ten minutes before the shooting he left the knoll and started down a draw which ran in a southerly or southwesterly direction. Heesen was not sure whether he checked the safety lever after he left the knoll and he was carrying the gun on his shoulder by the sling as he proceeded down the draw toward the point where the gun discharged.

At about this time, appellant, Jesse G. Lopez, was sitting next to a tree about fifty yards away from the point where Heesen's gun subsequently discharged. Appellant, in the company of two hunting companions, Bennie Aragon and Ramon Barela, had gone from Albuquerque to Ute Park on the afternoon of October 14, 1958,

and after spending the night in the area, commenced hunting on the morning of October 15th, the first day of deer season. After hunting all morning and again in the early afternoon, the party stopped to rest at the location where appellant was shot. It was then about 3:00 P.M. and appellant, dressed in bright hunting clothes, was sitting about twenty feet away from his two companions and scanning the area for game. After sitting there about four or five minutes, appellant observed an object to his right which was moving but which he could not identify. This was shortly before the shooting.

As appellee, Heesen, proceeded down the draw after leaving the knoll, he heard a "rustle" and saw a deer go between some trees to the left of his line of travel about 50 to 100 yards away. The deer, when observed, was in a direction about 80 or 90 degrees to the left of where appellant was sitting and Heesen did not observe appellant or his companions before the shooting. At about this time Heesen removed the rifle from the sling on his shoulder and held it by his right hand at or near the balance position of the weapon. He then came to a dead log in his path which was about eight or ten inches in diameter and was lying horizontally a foot or less off the ground with several dead limbs sticking upward from it. One of these limbs was a dead sapling sticking up about eighteen inches above the log and had a "fork" shaped like

a thumb and forefinger extended. Heesen wanted to cross the log to see the deer better, and as he stepped across the log his left foot caught on a little limb sticking out and caused him to stumble. His left foot went down hard on the ground on one side of the log and his right foot slipped on the grass. This brought the gun down and the gun discharged, the bullet striking appellant. Heesen testified that he had his hand at least six inches away from the trigger when the gun discharged. Immediately after the gun discharged he observed that the gun was on "fire" position.

Appellant was sitting on ground higher than Heesen at the time the gun discharged and subsequent investigation showed that the bullet had gone uphill, hit a dead tree and ricocheted several degrees to the left, and had thereafter struck some seedlings before hitting appellant in the chest. The bullet traveled approximately fifty yards altogether. Heesen went quickly to the spot where appellant was sitting, observed the seriousness of his condition, and Heesen and Lopez' companions made immediate arrangements to care for appellant. Heesen obtained medical aid.

There was testimony at the trial that when Heesen was going to the place of the accident with Dr. E. L. Lindsley, he told Dr. Lindsley that the gun discharged as he was moving it from "fire" position to the "safe" position.

Under point I, appellant contends that the trial court committed error in permitting testimony as to the general reputation of other firearms companies who use the same modified leaf safety device as the Higgins Model 51. A witness for appellee, Sears, Paul A. La Violette, Jr., qualified as an expert in gun designing and testified that the following companies had an excellent reputation in the small arms field: Fabrique Nationale of Belgium, Marlin Firearms Company, Weatherby Corporation, Colt Firearms Company, and Jefferson Corporation. Objection was made to this testimony on the ground that it was wholly immaterial and irrelevant to any issue in the case.

Appellant, in the third amended complaint, alleged that the Higgins Model 51 rifle was in a dangerous and defective condition due to its negligent manufacture, design, assembly or maintenance, in that the safety mechanism thereof moved readily and in a dangerous manner from "safe" to "fire" position. This is an allegation of an ultimate issue of fact which the jury had to decide. Here is an issue, the proper understanding of which by a jury composed of six men and six ladies, requires specialized knowledge or experience and cannot be determined independently merely from deductions made and inferences drawn on the basis of ordinary knowledge. The jury was instructed that expert testimony is intended only to assist them in coming to a correct conclusion upon facts which are of a technical nature, but that the opinion of experts was not binding upon them and the jury must determine the weight to be given to such testimony.

Appellant introduced evidence tending to prove that the safety device on the Higgins Model 51 rifle is easy to knock off safety, making the rifle dangerous. Appellant's witness, Frank Doyle, over appellee's, Sears', objection, expressed the opinion that the safety device, without the telescopic sight, is not a safe piece, in that the projection is too long and it is too prone to be knocked from "safe" to "fire" position. There is also testimony of certain tests made with the Higgins Model 51 and the witness, Ira Kessler, expressed the opinion that the Higgins Model 51 was unsafe without the telescopic sight. Another witness, Robert Allen, testified as to the manner in which the safety lever of the Higgins Model 51 moved from "safe" to "fire" position without his knowledge.

Appellee, Sears, introduced testimony of witnesses who were either experts in the small arms field or experts in gun designing. The witness, Paul A. La Violette, Jr., testified that he is a gun designer employed by High Standard Manufacturing Company who manufacture the Higgins Model 51 for Sears. He qualified as an expert gun designer with many years' experience with other rifle manufacturers and in factories designing and building weapons of the

small arms design. La Violette has two gun patents pending. La Violette testified that the safety device on the Higgins Model 51 is supplied to High Standard Manufacturing Company by Fabrique Nationale of Belgium. He also testified extensively as to the advantages of the safety device of the Higgins Model 51 and stated that six different makes of guns have the same modified leaf safety device as does the Higgins Model 51. The manufacturers of these guns are F. N. Mauser, Colt, Marlin, Nato and Weatherby. The evidence also shows that since 1951, 75,572 Higgins Model 51 rifles with the modified leaf safety device have been sold by High Standard Manufacturing Company to appellee, Sears. High Standard Manufacturing Company has never been sued by reason of the design of the Higgins Model 51 rifle. There is also opinion evidence that the Higgins Model 51 rifle is safe by all commercial sporting goods standards.

Appellant appears to concede that the number of rifles manufactured with the modified leaf safety device, and the fact that other companies manufacture guns with the same design, is relevant as tending to show that the design is proper. Appellant also seems to concede that the reputation of Fabrique Nationale of Belgium may be relevant to the issue.

Subsequent to the testimony as to the reputation of the various firearms companies who use a similar safety device as the Higgins Model 51, the witness, Paul A. La Violette, Jr., testified without objection that the Higgins Model 51 rifle is safe by all commercial sporting goods standards, and that the design of the safety device of the Higgins Model 51 was not negligent or defective. He also testified, without objection, that the safety device on the Higgins Model 51 rifle is excellent for hunting and fulfills the requirements of a good designer. The witness, Thomas Raymond Robinson, Jr., testified that in his opinion the Higgins Model 51 is good and practical in the field for a prudent hunter, and is suitable for hunting. Ira L. Kessler, an expert witness called by defendant, Heesen, testified that the Marlin Firearms Company has a fair reputation, and that the Colt Firearms Company has an excellent reputation.

On an issue such as we have here we believe the applicable rule to be as stated in Wigmore on Evidence, 3d Ed., Vol. II, § 461, p. 489, as follows:

"(1) The conduct of others *evidences* the tendency of the thing in question; and such conduct—e. g. in using chains on a hill, felt shoes in a powder-factory, railings around a machine, or in not using them—is receivable with other evidence showing the tendency of the thing as dangerous, defective, or the reverse. But this is only evidence. The jury may find from other evidence that the thing was

in fact dangerous, defective, or the reverse, and the maintenance was or was not negligence, in spite of the above evidence. * * *"

The conduct of others is proper evidence for a jury to consider in determining whether the tendency of the thing is dangerous, defective, or the reverse. Chicago Great Western Ry. Co. v. McDonough, 8 Cir., 161 F. 657; Wigmore on Evidence, 3d Ed., Vol. II, § 461, p. 495.

Under our Rule, § 21–1–1(43) (a), which is the same as the Federal Rule, the rule which favors the reception of the evidence governs, the basis being that any evidence which throws light on the question in issue should be admitted, leaving it to the trial court to hold the hearing within reasonable bounds. Mourikas v. Vardianos, 4 Cir., 169 F.2d 53; Lawrence v. Nutter, 4 Cir., 203 F.2d 540.

Circuit Judge Bratton, in a specially concurring opinion in United States v. Bowman, 10 Cir., 73 F.2d 716, 720, in stating the rule, quoted from United States Smelting Co. v. Parry, 8 Cir., 166 F. 407, as follows:

"It is true that in trials by jury it is their province to determine the ultimate facts, and that the general rule is that witnesses are permitted to testify to the primary facts within their knowledge, but not to their opinions. And it is also true that this has at times led to the statement that witnesses may not give their opinions upon the ultimate facts which the jury are to decide, because that would supplant their judgment and usurp their province. But such a statement is not to be taken literally. It but reflects the general rule, which is subject to important qualifications, and never was intended to close any reasonable avenue to the truth in the investigation of questions of fact. Besides, the tendency of modern decisions is not only to give as wide a scope as is reasonably possible to the investigation of such questions, but also to accord to the trial judge a certain discretion in determining what testimony has a tendency to establish the ultimate facts, and to disturb his decision admitting testimony of that character only when it plainly appears that the testimony had no legitimate bearing upon the questions at issue and was calculated to prejudice the minds of the jurors. * * *"

Applying the above principles we hold that the testimony as to the reputation of Fabrique Nationale, who manufacture the safety device on the Higgins Model 51, and the reputation of Marlin Firearms Company, Weatherby Corporation, Colt Firearms Company and Jefferson Corporation, who manufacture rifles which have

the same modified leaf safety device as the Higgins Model 51, was relevant to the issue of whether the safety device on the Higgins Model 51 was unsafe or safe, and that the trial court did not abuse its discretion in admitting this testimony.

■ Under point II appellant also contends that the trial court committed error in permitting evidence to be introduced as to the poundage pressure required to move the safety levers of various rifles from "safe" to "fire" position. There is no merit in this contention. Appellant's witness, Frank Doyle, testified fully as to his experience with guns and particularly with the Higgins Model 51 safety device, which he termed the dangerous feature of the safety mechanism in that it was "so easy to knock off." Doyle's testimony was introduced under appellant's contention that the Higgins Model 51 rifle was unsafe and thus the issue arose as to the pressure required to move the safety lever from "safe" to "fire" position. Under the circumstances it was proper for appellee, Sears, to show that the poundage pressure required to move the safety lever on a Higgins Model 51 from "safe" to "fire" measured two-and-one-half pounds, .and also to show the poundage pressure required in rifles with identical safety devices. The evidence discloses that the pound pressure required to move the safety lever on other similar devices was sometimes a little less and sometimes more than the Higgins Model 51.

■ Under point III appellant claims that the trial court erred in permitting the witnesses, La Violette, Thomas Robinson and Edwards Brown, to give opinion evidence that the safety mechanism on the Higgins Model 51 rifle was negligently or defectively designed. Objection was made to this testimony on the ground that this was an opinion upon a subject which is within the province of the jury to determine and.that the question asked calls for an opinion as to a question of law and fact.

This contention, we think, must be rejected. The testimony of these witnesses, all experts in their field, was upon the ultimate issue of fact of whether the safety device on the Higgins Model 51 was dangerous and defective or unsafe, and was properly the subject of expert testimony. Opinion evidence on an ultimate issue of fact does not attempt or have the power to usurp the functions of the jury, and this evidence could not usurp the jury's function because the jury may still reject these opinions and accept some other view. Opinion evidence offered by both parties in this case was not binding upon the jury and they were so instructed. See Wigmore on Evidence, 3d Ed., Vol. VII, § 1920, p. 17; Hooper v. General Motors Corp., 123 Utah 515, 260 P.2d 549.

In Millers' National Ins. Co., Chicago, Ill. v. Wichita Flour Mills Co., 10 Cir., 257 F.2d 93, 100, the court said:

216

"The insurance companies assert that McDonald was improperly permitted to invade and usurp the province of the jury in that the sole issue was whether there was an explosion and McDonald was allowed to testify that there was an explosion. The controlling rule as stated by the United States Supreme Court is that where the matter under inquiry is properly the subject of expert testimony, it is no objection that the opinion sought to be elicited is upon the issue to be decided. That rule has been followed in this circuit and applied in two recent decisions."

See also Eickmann v. St. Louis Public Service Co., 363 Mo. 651, 253 S.W.2d 122; United States Smelting Co. v. Parry, 8 Cir., 166 F. 407; Nelson v. Brames, 10 Cir., 1957, 241 F.2d 256; and Cropper v. Titanium Pigment Co., 8 Cir., 47 F.2d 1038.

In 20 Am.Jur., Evidence, § 775, p. 647, the rule is stated as follows:

" * * * In such cases, witnesses possessing requisite training, skill, or knowledge, denominated 'experts,' may testify, not only to the facts, but to their opinions respecting the facts, so far as necessary to enlighten the jury and to enable it to come to a right verdict. * * * Issues of this kind are said to create a necessity for the admission in evidence of the opinions or conclusions of witnesses who are shown to be specially skilled or experienced in the particular field in question."

Appellant's final objection to the opinion testimony is that the question asked of the witnesses calls for an opinion as to a question of law and fact.

Many of the cases cited by appellant on this point are automobile accident cases which hold that an expert or a non-expert witness cannot express an opinion that the defendant was negligent. The reasoning behind these cases is that this is within the field of knowledge and understanding of the jury and is not a matter requiring technical assistance of persons having unusual knowledge of the subject by reason of skill, experience, or knowledge.

The parties agree that the ultimate issue of liability is for the jury to determine and that a witness cannot express an opinion on a matter of law, as distinguished from an ultimate fact. The ultimate issue in this case was whether the safety mechanism on the Higgins Model 51 rifle was in a dangerous and defective condition due to its negligent design, in that it moved readily and in a dangerous manner from "safe" to "fire" position.

Appellant's witnesses testified at great length in what respect they considered the

safety mechanism "dangerous," "unsafe," and "defective," and expressed the opinion that the safety mechanism was not a safe piece and was unsafe without the telescopic sight. Appellees' expert witnesses likewise testified in great detail as to the safety mechanism and they were of the opinion that the safety mechanism on the Higgins Model 51 rifle was safe by all commercial sporting goods standards, was suitable for hunting, and was not negligently or defectively designed. Thus the jury was free to adopt either view and then fix the liability.

■ The word "negligence" is sometimes used in a broad sense and sometimes in a narrow sense. In the broad sense it includes the elements of liability. In the narrow sense the element of liability is excluded. Pittsburgh, C., C. & St. L. Ry. Co. v. Nichols, 78 Ind.App. 361, 130 N.E. 546, 553.

> " * * * An allegation of negligence as applied to the conduct of a party is not a mere conclusion of law, unless made so by the law, but the statement of an ultimate pleadable and provable fact. * * * "

Peavy v. Hardin, Tex.Civ.App.1926, 288 S.W. 588, 589. See also Gower v. Lamb, Mo.App.1955, 282 S.W.2d 867; Ege v. Born, 212 Iowa 1138, 236 N.W. 75; Cohen v. Swiller, 1959, 17 Misc.2d 921, 186 N.Y.S.2d

844; Louis v. Smith-McCormick Const. Co., 1917, 80 W.Va. 159, 92 S.E. 249; and Hooper v. General Motors Corp., 123 Utah 515, 260 P.2d 549.

Beal v. Southern Union Gas Co., 66 N.M. 424, 349 P.2d 337, follows the rule that an expert witness can express an opinion on an ultimate issue of fact, but cannot testify as to the ultimate issue of liability.

There is much confusion among the decisions due to the language used by the courts in explaining why opinion testimony should be excluded. Some courts say that the opinion would "usurp the functions of the jury." Other courts say that the opinion should not be received because "that is the question which the jury must decide." If we are to add to this, the additional confusion which exists in the decisions as to whether negligence is a question of law or fact, or is a mixed question of law and fact, we would tend to create more confusion and add to the fine distinctions and limitations.

■ Opinion evidence is admissible on the basis that it will aid the jury to understand the problem and lead them to the truth on the ultimate facts, and opinions may be disregarded by the jury in whole or in part. It is left to the jury to decide the issue. See Seal v. Blackburn Tank Truck Service, 64 N.M. 282, 327 P.2d 797; and Hooper v. General Motors Corp., supra.

From a careful consideration of the record, we have come to the conclusion that when we consider all of the testimony bearing upon the question of whether the rifle was dangerous and defective due to its negligent design, that when appellee used the term "negligent or defective," he was using the word "negligent" in a narrow sense and as to an ultimate and provable fact. This excluded the element of liability. It was for the jury to fix the ultimate liability of either party. All of the facts went to the jury and it is our view that under all of the facts and circumstances of this case, the expert opinions expressed were not improperly admitted.

The trial court did not abuse its discretion in permitting the experts to express their opinion. Bunton v. Hull, 51 N.M. 5, 177 P.2d 168; State v. Padilla, 1959, 66 N.M. 289, 347 P.2d 312; and Wells Truckways v. Cebrian, 1954, 122 Cal.App.2d 666, 265 P.2d 557.

Finding no error in the record, the judgment of the district court is affirmed. It is so ordered.

COMPTON, C. J., and CARMODY, J., concur.

MOISE and NOBLE, JJ., not participating.