616 P.2d 1127
**MOSS THEATRES, INC.,**
**Plaintiff–Appellant,**

v.

**Jerry K. TURNER, d/b/a Turner Fence Company, Defendant–Appellee.**

**No. 4109.**

Court of Appeals of New Mexico.

Aug. 14, 1980.

J. Wayne Woodbury, Silver City, for plaintiff–appellant.

Suzanne E. Jollensten, Foy, Foy & Jollensten, Silver City, for defendant–appellee.

## OPINION

HERNANDEZ, Judge.

Plaintiff sued defendant for breach of contract, which contract was for the construction of a fence around part of plaintiff's drive–in movie theatre. Plaintiff alleged that defendant had designed and erected the fence in a negligent and unworkmanlike manner. Defendant counterclaimed for the unpaid balance due him. The jury rendered a verdict in favor of defendant and this appeal ensued.

The pertinent facts are these: The county officials required that plaintiff increase the heighth of the existing fence around its drive–in theatre so as to completely obstruct the view of the screen from the adjoining highway. Plaintiff contacted defendant and together they determined that the existing fence had to be raised about 12 feet, making a total height of approximately 24 feet. Various types of fencing were discussed between defendant and Charles J. Moss, the co–owner and operator of the theatre. The testimony as to these various discussions was conflicting, Mr. Moss saying in effect that Mr. Turner made the final decision and defendant saying that Mr. Moss made the final decision as to the type of fencing based on cost. The final decision was to construct a chain–link fence with diagonal metal slats in "every other diamond." Later on it was determined that slats had to be inserted in every diamond to obstruct the view. The fence was completed and destroyed the following day by a high wind.

Plaintiff alleges two points of error, the first being that the trial court erred in

denying its motion for a judgment notwithstanding the verdict on the issue of defendant's negligence as a matter of law. Plaintiff argues that defendant was guilty of negligence as a matter of law because the fence as constructed did not comply with the standards established by the Uniform Building Code of the State of New Mexico.

At this point it is necessary to note that the defendant in his answer to plaintiff's complaint affirmatively pled both estoppel and waiver and the jury was so instructed. The jury was also instructed that if the defendant had conducted himself in violation of the Uniform Building Code that such conduct constituted negligence as a matter of law.

■■■ The principal question then becomes, can a person waive or be estopped from asserting a statutory right or advantage? The answer is yes.

*Outboard Marine Corp. v. Superior Ct., Cty. of Sacramento*, 52 Cal.App.3d 30, 124 Cal.Rptr. 852 (1975), states:

The doctrine of waiver is generally applicable to all the rights and privileges to which a person is legally entitled, including those conferred by statute unless otherwise prohibited by specific statutory provisions.

The doctrine of waiver is applicable to contract rights or benefits.

*Oleg Cassini, Inc. v. Coture Coordinates, Inc.*, 297 F.Supp. 821, (D.C.1969), states:

A party may, by words or conduct, waive a provision in a contract or eliminate a condition in a contract which was inserted for his benefit [citations omitted.] and no consideration is necessary for such a waiver to be effective.

*Reinhart v. Rauscher Pierce Securities Corp.*, 83 N.M. 194, 490 P.2d 240 (Ct.App. 1971), states:

Estoppel is the preclusion, by acts or conduct, from asserting a right which might otherwise have existed, to the detriment and prejudice of another, who in reliance on such acts and conduct, has acted thereon.

*Bastanchury v. Times–Mirror Co.*, 68 Cal. App.2d 217, 156 P.2d 488 (1945), states:

Whether the established facts in any given case constitutes, in its most technical sense, an "equitable estoppel" or a "waiver" is not always easily distinguishable. . . . Strictly speaking, the latter is used to designate the act or the consequence of the act of one person only, while the former is applicable where one's conduct has induced another to take such a position that he will be injured if the first be permitted to repudiate his acts. [Citation omitted.]

A waiver is the intentional relinquishment of a known right or such conduct as warrants an inference of the relinquishment of such right and may result from an express agreement or be inferred from circumstances indicating an intention to waive. [Citations omitted.]

The rule is clearly stated . . . that one may waive a right given by contract or advantage of law intended for his benefit.

This brings us to the question posed by plaintiff's first point of error, i. e., whether the trial court erred in denying its motion for judgment notwithstanding the verdict.

A judgment notwithstanding verdict is proper only in those cases where it can be said that there is neither evidence nor inference from which the jury could have arrived at its verdict. . . . It is for the jury under proper instructions to determine the weight and significance of each fact in evidence. *Chavira v. Carnahan*, 77 N.M. 467, 423 P.2d 988 (Ct.App. 1967).

The question of the establishment of an affirmative defense, which defense is based on questions of fact is one for determination by the jury and not by the court, when there is sufficient evidence to substantiate the finding of the jury. *See Gordon v. Eureka Casualty Co.*, 187 Pa. Super. 636, 146 A.2d 379 (1958).

Some of the most pertinent and most damaging evidence against plaintiff's position came from the testimony of Mr. Moss, which reads in part:

I suggested a telephone pole, tin–type fence, but I thought we should go to a

chain–link fence. With vinyl diagonal slats in it for the reason that instead of having the full metal fence up, the wind, the whole pressure of the wind would be against it. With this chain–link fence, some of the wind could go–some of the wind could go through. Mr. Turner was the one who told me, I did not know this, but a prior fence had blown down, which was of a concrete construction. And that an old type board screen had blown down. So he knew of the wind factor there. And I knew of the wind factor there. I flew to Taos to look at a drive–in out there that was made out of telephone poles, two by fours and corrugated metal. They said it had been up about five years and had been about the same height that we were talking about. . . .

It appeared to me that a chain–link fence would still be better because it was not solid. Part of the wind could blow through it.

.    .    .    .    .

Q. Do you recall telling Mr. Evatt that the cost of the telephone pole and tin fence was prohibitive and you had to go this other route?

A. That is was prohibitive?

Q. That is was too expensive.

A. Yes, I probably did with what I was getting, yes. I really don't recall talking to Mr. Evatt, but I've talked to him quite a bit about the business because he has worked for me before.

Q. When you discussed adding the additional vertical slats with Jerry, did you discuss the problem of increased wind resistance?

A. That was discussed at the very beginning of the contract.

Q. Did he advise you that increasing those additional slats would substantially increase the wind resistance?

A. I knew that. As far as he stating to me in those exact words, no.

Mr. Eddie Evatt, a former employee of plaintiff's, testified in part as follows:

Q. What discussions did you have with Mr. Moss concerning fences?

A. Basically he wanted by to get him a price of what it would cost to fence the highway side as far as material. went. We made, oh, probably three to five phone calls on getting the price on posts, and the wire–not the wire, but the tin. And, he at that time was going to fly somewhere to look at a fence of this nature. And when he got back I had the price for him and he said it was too expensive.

Q. What was the approximate price?

A. There again, to the best of my knowledge, it was like the tin and poles, and everything, not counting putting it up, this is just material, was going to run probably $12–$15,-000.

.    .    .    .    .

Q. Did you ever discuss the types of fences, as far as quality was concerned?

A. As far as–well, like I say, he went up and looked at the pole fence. He told me that the pole fence would stand up, he thought, far better. But he just couldn't afford the price.

.    .    .    .    .

Q. Did you ever discuss this particular fence with Jerry Turner?

.    .    .    .    .

A. At that time Jerry thought that he wasn't going to be able to guarantee the fence. He was just going to put up the fence.

Q. Did you have any conversations with Mr. Moss concerning this, as far as guarantee is concerned?

A. Mr. Moss never did in so many words tell me anything about the guarantee. He left the impression that he knew that the guarantee would not be there.

The defendant testified in part as follows:

Q. In your discussions with Mr. Moss, did you propose certain alternatives?

A. Yes, I did.

Q. What sorts of alternatives did you discuss with Mr. Moss?

A. Well, the pole fence was one which he referred to.

Q. Could you speak louder?

A. The telephone pole type fence, we discussed it. I told him about the heavy weight pipe, but the cost was just a little bit over double, of the tubing in the same structure.

Q. You say that you considered cost to be a major factor, was that based upon anything that Mr. Moss said to you?

A. Right. Talking to him over the phone and at the drive–in, off and on.

. . . ' .

Q. Did he make any indication to you after he took this trip to Taos, as to his opinion of the telephone pole and tin fence?

A. Yes, it was too expensive, after he checked on it.

Q. Did you discuss, I believe you testified a few moments ago that you discussed all vertical poles, all new vertical poles, is that correct?

A. Yes.

Q. What did you discuss as far as the cost of all new vertical posts?

A. I tried to explain to him that the length was a factor, and it would have to be a heavier post to go that heighth. That's just–it would be a complete new fence is what is amounted to.

Q. Did you discuss the cost of the fence?

A. Yes, it would be more expensive.

Q. What kind of posts did you discuss using?

A. Various, schedule 40 pipe. And then in inches, 2½, 3 inch, that we never got into because of the cost. I tried to explain to him the cost factor; it was heavy pipe.

Q. Did you give him an approximation of the cost, with altogether new vertical posts?

A. Right. I told him that if we went with the diagonals and verticals that it would approximately double what this fence would cost, that I installed.

Q. This was approximately $9,800?

A. $9,850.

Q. And the price to go to all new vertical posts in this size diagonals would approximately double?

A. Yes, ma'am.

Q. Did he express an opinion whether he wished to proceed in that manner?

A. No ma'am. He didn't like the price, when I came up with this price.

. . . . .

Q. Did you make Mr. Moss aware of the types of materials you were planning on using?

A. Yes, I did.

Q. How did you make him aware?

A. Well, before we began, we cut pieces of two inch and 2½ inch tubing, small cut pieces, so he could see what I was talking about.

Q. And did he approve those lengths of tubing?

A. Yes.

This testimony constituted substantial, probative evidence from which the jury could have arrived at their verdict that the plaintiff had waived any right given it by the Uniform Building Code or that he was estopped to assert such right. The trial court, in our opinion, properly declined to grant plaintiff's motion.

Plaintiff's second point of error is that the trial court erred in refusing to give its requested instruction as to defendant's breach of implied warranty of skill and workmanship. It is our opinion that this point is without merit for two reasons. First, the evidence was uncontradicted that the work performed by defendant had been done in a skillful and workmanlike manner. Granted, plaintiff's expert witness testified that the fence did not conform to the Uniform Building Code but he was never asked if what had been done was not done in a skillful and workmanlike manner. The

second reason is that the plaintiff assumed the risk and under such circumstances there is no room for the application of implied warranties against the defendant.

An implied warranty is one which the law derives by implication from the nature of the transaction or the relative situation on circumstances of the parties. Black's Law Dictionary 1759 (4th ed. 1968). "It has been held that implied warranties, unlike express warranties are arrived at by operation of law and conclusions announced by the court upon established facts. They are based wholly on implications of law as distinguished from inferences or implication of fact. *Belt Seed Co. v. Mitchelhill Seed Co.*, 236 Mo.App. 142, 153 S.W.2d 106." *Mullins v. Sam Scism Motors, Inc.*, 331 S.W.2d 185 (Ct.App.Mo.1960).

The court must first, therefore, examine the established facts of the case to determine if an implied warranty should be created by operation of law. This is what was done in *Glass v. Wiesner*, 172 Kan. 133, 238 P.2d 712 (1951).

The defendant Wiesner relies on the doctrine of implied warranty and cites statements of law from various cases. He leans heavily on a statement contained in *City of McPherson v. Stucker*, 122 Kan. 595, 256 P.2d 963, which reads:

"When the principal object of a contract is to obtain a result, there has been no compliance with the contract until the result has been obtained.

" 'Where the contract contains a guaranty or warranty, express or implied, that the builder's work will be sufficient for a particular purpose, or to accomplish a certain result, unless waived by the owner, the risk of accomplishing such purpose or result is on the builder, and there is no substantial performance until the work is sufficient for such purpose or accomplishes such result.' 9 C.J. 745." 122 Kan. at page 600, 256 P. at page 966.

We adhere to that rule. The trouble here lies in its application to the instant facts. Clearly the memorandum agreement contains no express warranties.

Moreover it nowhere attempts to imply what amount of grain the elevator and quonset addition were expected to accommodate. In view of the conflicting testimony the court had a right to believe the facilities were constructed in accordance with Wiesner's directions and against plaintiff's admonition that they were inadequate and that defendants agreed to assume the risk. Under such circumstances there is no room for the application of the doctrine of implied warranties against the builder. *Glass v. Wiesner*, supra.

The established facts in this case show that plaintiff selected the type, size and strength of materials to be used, in spite of being admonished that they might not prove sufficient to withstand the winds prevalent in that area. We see no basis for an implied warranty to arise by operation of law upon those facts.

We affirm.

IT IS SO ORDERED.

SUTIN, J., specially concurs.

ANDREWS, J., dissents.

SUTIN, Judge (specially concurring).

I concur. This opinion will supplement the opinion of Judge Hernandez.

On May 11, 1978, Moss and Turner entered into a verbal agreement wherein Turner agreed to build a high chain–link fence atop an existing board fence around a part of the Moss Drive–In Theater. To effect this agreement, Turner executed a Bill of Sale form with Moss as the purchaser which stated the amount of the contract price and the materials to be installed. Although the form referred to Moss as the purchaser and Turner as seller, it was, in fact, a part of the contract by Turner to build a chain–link fence for Moss, and it was so recognized by the parties. The purpose of the fence was to obstruct the view of the drive–in theater screen from persons on the highway.

Prior to the agreement, Moss made an investigation. He learned that a telephone

pole–tin type fence was much stronger in wind resistance, but the expense of erecting such a fence was so great, Moss decided to have a chain–link fence. Moss and Turner knew of the wind factor. It was discussed from time to time. In fact, Moss was a pilot and a good judge of wind. Moss testified that Turner gave no written guaranty. In the "stipulation," however, Turner said, "he would not guarantee it (the fence) against a twister." The fence could withstand a wind velocity of 51.5 mph.

Turner completed work on July 20, 1978. The following afternoon, on July 21, 1978, the wind blew so hard, it damaged use of the fence. Moss testified that "95% of the fence was good."

Rather than pay the balance due on the purchase price, Moss sued Turner for damages for breach of contract and Turner counterclaimed. The jury found against Moss on his complaint and in favor of Turner on his counterclaim. Moss appealed. I would also affirm.

Moss raised two points in this appeal:

(1) Moss was entitled to a directed verdict and judgment N.O.V. *on the issue of Turner's negligence as a matter of law.*

(2) The court failed to instruct as to Turner's breach of implied warranty of skill and workmanship.

### A. *Moss was not entitled to a directed verdict or judgment N.O.V.*

An expert witness for plaintiff and one for defendant testified that defendant violated the Uniform Building Code. However, the opinion of an expert witness, although uncontradicted, is not conclusive of the fact in issue. This is made evident by U.J.I. 15.1 on Expert Testimony which was submitted to the jury. The fact finder may reject expert opinion evidence in whole or in part. It is left to the jury to decide. *Lopez v. Heesen,* 69 N.M. 206, 365 P.2d 448 (1961); *Van Orman v. Nelson,* 78 N.M. 11, 427 P.2d 896 (1967); *Lucero v. Los Alamos Constructors, Inc.,* 79 N.M. 789, 450 P.2d 198 (Ct.App.1969); *State v. Smith,* 80 N.M. 126, 452 P.2d 195 (Ct.App.1969). An expert opinion is intended to aid the jury. In the instant case, it did not insofar as a violation of the Code was concerned.

Plaintiff was protected by the court's instruction to the jury that a violation of the Code was negligence per se. Plaintiff was not entitled to more. A detailed recitation of the testimony is unnecessary. Neither is a philosophical approach necessary to explain the reasons for the rule. This, of course, is not intended to disparage the use of expert testimony in exceedingly complex issues such as the effect of wind velocity on a large fence. Even the explanations attempted by the engineers were probably unclear to the jurors as they were to me.

Even though defendant may have been negligent, proximate cause of the damage to the fence was an issue of fact. The jury could well believe that the damage was caused solely by an unusual and extraordinary strong wind and not from any defect in the fence.

Innumerable opinions have stated that a court of review does not sit as a jury in the determination of factual issues.

Plaintiff relies on *Owen v. Burn Const. Co.,* 90 N.M. 297, 563 P.2d 91 (1977) in which the Court of Appeals was reversed and a directed verdict for plaintiff held proper. Although not stated in the opinion, nor publication of the Court of Appeals opinion ordered, I dissented in favor of plaintiff. *Owen* correctly stated the law but it should be exercised with caution. For the meaning of "reasonable minds" that cannot differ to justify a directed verdict see, *Anderson v. Welsh,* 86 N.M. 767, 527 P.2d 1079 (Ct.App.1974).

We cannot say in the instant case that evidence of negligence and proximate cause as issues of fact are so undisputed as to become questions of law.

Plaintiff was not entitled to a directed verdict or judgment N.O.V.

### B. *Plaintiff was not entitled to implied warranty instructions.*

Plaintiff claims the trial court erred in failing to instruct the jury on its requested

instruction Nos. 17, 18 and 19 as to defendant's breach of implied warranty of skill and workmanship. These requested instructions read:

(17) Where a person is employed in work of skill, the employer buys both his labor and his judgment; he ought not to undertake the work if he cannot succeed, and he should know whether it will or not. *Andriola v. Milligan*, 52 N.M. 65 [191 P.2d 716].

(18) The court further instructs you that the Defendant impliedly warranted that he would exercise such reasonable degree of skill as the nature of the services required. *Garcia v. Color Tile Distributing Company*, 75 N.M. 570, 408 P.2d 145 (1965); *Andriola v. Milligan*, 52 N.M. 65, 191 P.2d 716 (1948).

(19) If you find that the fence constructed by Defendant was not fit for the uses and purposes for which it was purchased and that such fence failed to remain erect, it is defective in its construction and your verdict should be for the Plaintiff. *J. B. Colt Co. v. Chavez et al.*, 34 N.M. 409 [282 P. 381].

The trial court was inclined to give No. 18, supra, but when defendant stated:

I think that the instructions under the Uniform Building Code that that would be prejudicial to the defendant.

The court said:

I'm going to leave them all out.

When requested instructions are proper and the court refuses to give them, the failure of the court to explain why they were not given constitutes reversible error. *Clinard v. Southern Pacific Company*, 82 N.M. 55, 475 P.2d 321 (1970); see *Archibeque v. Homrich*, 87 N.M. 265, 270, 531 P.2d 1238 (Ct.App.1975), certification to Supreme Court, Sutin, J. It would have been helpful in this appeal if the court had explained its refusal to give the requested instructions.

Was Moss entitled to instructions on implied warranty?

When we view the meaning of an implied warranty and its relationship to the issues in the case, the court did instruct the jury on the "implied" warranties requested.

An implied warranty is not one of the contractual elements stated in an agreement. It arises independently and outside of the contract. The law, however, annexes it to the contract. By implication, the law writes an implied warranty into the contract which the parties made. *Tharp v. Allis–Chalmers Mfg. Co.*, 42 N.M. 443, 81 P.2d 703 (1938). When a person contracts to perform work or render a service, without an express warranty, the law implies that a contractor who undertakes to design and install a product must do so in a good and workmanlike manner and in a manner benefiting a skilled contractor. *Reliable Elec. Co. v. Clinton Campbell Contractor, Inc.*, 10 Ariz.App. 371, 459 P.2d 98 (1969); *Clear v. Patterson*, 80 N.M. 654, 459 P.2d 358 (1969); *Gilley v. Farmer*, 207 Kan. 536, 485 P.2d 1284 (1971).

When an implied warranty is written into the agreement of the parties, it constitutes a provision in the contract made by the parties. In effect, it then becomes an express warranty as though it had been included in the written contract or agreed upon orally by the parties.

Moss requested and the court adopted Moss' Requested Instruction No. 1. It reads in pertinent part:

The Plaintiff claims that it sustained damages and that the proximate cause thereof was one or more of the following claimed acts:

   *     *     *     *     *     *

3. Breach of contract in that Defendant failed to construct said fence in a skillful and workmanlike manner.

4. Breach of contract in that defendant represented to Plaintiff that he had sufficient knowledge and expertise to properly design and construct said fence, but said fence failed as a result of its improper design and construction.

These instructions are "implied" warranties. When written into the agreement of the parties, they became express warranties. Plaintiff was not entitled to the "implied" warranty instructions tendered.

The parties can also contract against implied warranties. *Tharp, supra.*

In the instant case, a fear existed that the chain–link fence might not serve its purpose, solely due to the velocity of the wind. As a result, both parties agreed that Turner would not guarantee the fence against a twister, a "dust devil." For the meaning of "dust devil," see *Pavlos v. Albuquerque National Bank,* 82 N.M. 759, 487 P.2d 187 (Ct.App.1971), 56 A.L.R.3d 558 (1974), Sutin, J., dissenting. A "dust devil" is a product of hot and dry desert country and is a matter of common knowledge in the southwest. In its popular sense, it is a windstorm, distinguished by its concentrated force and violence, so resistless as to make it especially destructive in its narrow pathway.

A guaranty, like a warranty is collateral to, and made independently of, the principal contract which is guaranteed. *Commonwealth Cotton Oil Co. v. Lester,* 156 Okl. 93, 9 P.2d 738 (1932); *Trego WaKenney State Bank v. Maier,* 214 Kan. 169, 519 P.2d 743 (1974); 38 C.J.S. *Guaranty* § 2 (1943). "Warranty" and "guaranty" are undertakings by one party to indemnify another party against some possible default or defect and may be used interchangeably. *Commonwealth Cotton Oil Co., supra; Gay Oil Co. v. Roach,* 93 Ark. 454, 125 S.W. 122, 137 Am.St.R. 95, 27 L.R.A.(N.S.) 914 (1910); *Tate–Jones & Co. v. Union Electric Steel Co.,* 281 Pa. 448, 126 A. 813 (1924); *Saranac Automatic Mach. Corporation v. Duke,* 67 F.2d 436 (5th Cir. 1933).

Moss and Turner contracted against any warranty, express or implied, if the damage to the fence was caused by a "twister."

The parties dealt at arm's length. It was Moss, not Turner, who wanted the chain–link fence. It was Moss, not Turner, who, with knowledge of the wind factors, gambled the violent action and destructive force of the wind. Moss agreed to assume the risk. Under these circumstances there is no room for the application of the doctrine of implied warranties against Turner. *Glass v. Wiesner,* 172 Kan. 133, 238 P.2d 712 (1951).

An implied warranty, as to the reasonable degree of skill necessary as the nature of the service requires, would arise if and when Turner would represent to Moss that the chain–link fence would withstand or resist the pressure of an unusual and extraordinary wind. *Garcia v. Color Tile Distributing Company,* 75 N.M. 570, 408 P.2d 145 (1965). Turner made no representations. Regardless of the skill used by Turner or the design of the fence, Moss contracted that Turner was free of liability for damage done by a "twister." In this light, Moss waived any implied warranties with reference to skill, design or purpose. None of these implied warranties, even if applicable, had any effect upon the cause of the damage.

These were issues submitted to the jury. The jury found for Turner. We do know that Turner did not breach the contract. He conformed with the Uniform Building Code and built the fence in a skillful and workmanlike manner. The fence did not fail as a result of any improper design and construction.

Persons who contract to have extensive, unusual fences built for them, do not, as do purchasers of fences already built, first arrive upon the scene when there is a completed fence. On the contrary, they can, and often do, watch the construction from inception before defects are covered over beyond discovery. Many persons would have insufficient knowledge to protect themselves under such circumstances. Nevertheless, they do have the opportunity to inspect, or to arrange for expert inspection by engineers at all stages of construction. They do not have to await trial to produce expert testimony.

Generally, persons like Turner are not placed in a position of impliedly guaranteeing or warranting the design of a chain–link fence or its suitability for a particular purpose in a dangerous wind area unless he undertook this obligation by express agreement. Turner refused to accept this responsibility. Turner's responsibility was not one implied by law merely from the act of building a chain–link fence which Moss

had selected, and which Moss agreed would exempt Turner from liability for damage done by wind velocity. Breach of contract provided an adequate remedy and Moss lost.

This philosophical, judicial approach was exemplified in *Chandler v. Bunick*, 279 Or. 353, 569 P.2d 1037 (1977).

The New Mexico cases, supra, relied on by Moss, properly wrote implied warranties into the agreement of the parties. But none of these cases involved the problems that are prominent in this case.

I would affirm the judgment.

ANDREWS, Judge (dissenting).

The issue in this appeal is whether the trial court erred in failing to instruct the jury as to implied warranty in a contract action where the plaintiff adduced evidence as to the negligence of, and failure to exercise a reasonable degree of skill, by the defendant.

Plaintiff (Moss Theatres, Inc.) acting through its agent Moss, contracted with defendant (Turner Fence Company) for the construction of a fence. Defendant contractor discussed the proposed project with the plaintiff and advised Moss that a light–weight fence might not stand up to the winds which were known to be strong in the area. Moss stated that he did not have sufficient funds to go to a heavier grade of fencing and ordered that the lighter fence be built. Plaintiff paid $7,450.00 in advance and the fence was constructed. Some time afterward, but before the balance due on the contract was paid, a strong wind ruined the fence. Plaintiff brought suit on the basis of a breach of contract, alleging that defendant had been negligent in performance. Defendant counter–sued stating that it had performed according to specifications and that it was entitled to the balance of $3,842.96 outstanding on the contract.

At trial plaintiff sought to show that the fence was constructed in violation of the relevant building code and that the damage would not have occurred but for the failure of the fence to meet these code provisions. The trial court refused plaintiff's request for a directed verdict based on negligence per se and instructed the jury on proximate cause—clearly deciding that there was a factual question as to the proximate cause.

Plaintiff then requested that the trial court instruct the jury as to implied warranty. The requested instructions were:

17.

\* \* \* \* \* \*

Where a person is employed in work of skill the employer buys both his labor and his judgment; he ought not to undertake the work if he cannot succeed, and he should know whether it will or not. (Citation omitted.)

18.

\* \* \* \* \* \*

The court further instructs you that the defendant impliedly warranted that he would exercise such reasonable degree of skill as the nature of the services required. (Citation omitted.)

19.

\* \* \* \* \* \*

If you find that the fence constructed by the defendant was not fit for the uses and purposes for which it was purchased and that such fence failed to remain erect, it is defective in its construction and your verdict should be for the Plaintiff. (Citation omitted.)

The trial court refused these instructions, and submitted instructions on contract and the negligence of the plaintiff. The plaintiff now appeals a verdict for the defendant and assigns as error the court's failure to find negligence per se and to properly instruct the jury as to implied warranty.

A party is entitled to instructions on a theory which has been pled if there is some evidence on the point. *Mac Tyres, Inc. v. Vigil*, 92 N.M. 446, 589 P.2d 1037 (1979). Defendant, in arguing that the refusal was

correct, emphasizes two positions. The first is that the general instruction as to the plaintiff's case was sufficient—thus, any further instruction would have been unduly repetitious. I disagree. The statement of the case was a general outline and in no way formalized any of the concepts which would have informed the jury of the implied warranty theory.

Defendant's second point is that the judge could very well have believed that plaintiff assumed any risk of possible failure of the fence when it chose the lower priced fence over defendant's warning. Thus, we are asked to assume that the trial court, as a matter of law, determined that an implied warranty theory was impossible under the evidence adduced.

An examination of the law of this state reveals no cases directly addressing this point. We are urged to accept the holding in a Kansas case, *Glass v. Wiesner,* 172 Kan. 133, 238 P.2d 712 (1951), to support the proposition that if the trial court was of the opinion that there was no evidence supporting the warranty theory, it was not an error to refuse instructions 17, 18 and 19. In *Glass v. Wiesner, supra,* the court noted:

> In view of the conflicting testimony the Court had a right to believe the facilities were constructed in accordance with Wiesner's directions and against Plaintiff's admonition that they were inadequate and that Defendants agreed to assume the risk. Under such circumstances there [was] no room for the application of the doctrine of implied warranties against the builder.

*Id.,* 238 P.2d at 716. While this is a correct statement of the law, the defendant incorrectly relies on this point to support its position. The very crux of the *Glass* case was that the court had the duty to decide both the law and the facts—it was not a jury trial. The decision states that "the Court had the right to believe: that certain conditions and statements did in fact occur; in short, the issue was one of fact. Only by making a series of factual findings was it possible for the court to then decide that the warranty issue was not applicable.

In the instant case, though, the level of skill and the quality of the goods delivered was presented to the jury as a factual issue. Certainly, the trial court might have been of the opinion that the warranty theory was not supported by the evidence. The question should have been, however, whether there was any evidence upon which the jury might have found that such a warranty had in fact existed and had been breached.

In my opinion, the trial court erred in refusing to instruct the jury as to warranty as requested. I would reverse.