**SYNALLOY CORPORATION, Plaintiff,**

v.

**Richard E. GRAY, Chariot Holdings, Ltd., Chariot Plastics, Inc., and the Chariot Group, Inc., Defendants.**

**The CHARIOT GROUP, INC., Counterclaimant,**

v.

**SYNALLOY CORPORATION, James G. Lane, Jr., Richard E. Ingram, C.D. Vinson, Sibyl N. Fishburn and Glenn R. Oxner, Counterclaim Defendants.**

**Civ. A. No. 91–305 MMS.**

United States District Court, D. Delaware.

April 7, 1992.

Edmond D. Johnson and Alan J. Stone, of the law firm of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff and counterclaim defendants.

Henry E. Gallagher, Jr. and Arthur G. Connolly, III, of the law firm of Connolly, Bove, Lodge & Hutz, Wilmington, Del., for defendants and counterclaimant.

## OPINION

MURRAY M. SCHWARTZ, Senior District Judge.

Plaintiff in this case is the Synalloy Corporation ("Synalloy"). Defendants are Richard E. Gray, Chariot Holdings, Ltd., Chariot Plastics, Inc., and the Chariot Group, Inc. ("defendants"). The Chariot Group, Inc., ("Chariot Group") is also a counterclaimant against counterclaim de-

fendants Synalloy Corporation, James G. Lane, Jr., Richard E. Ingram, C.D. Vinson, Sibyl N. Fishburn and Glenn R. Oxner (also "Synalloy"). On February 11, 1992, pursuant to Rule 37 of the Federal Rules of Civil Procedure, Synalloy filed a motion to compel Chariot Group to produce documents and respond to questions at depositions relating to Chariot Group's amended counterclaim. Chariot Group has refused to produce documents citing the attorney-client privilege. Additionally, it is expected that Chariot Group will refuse to answer questions on these same topics at future depositions.

Presently before the Court is Synalloy's motion to compel. For the reasons that follow the motion will be granted.

## I.

On May 24, 1991, plaintiffs filed a complaint against defendants seeking to recover "short-swing profits" allegedly recoverable under Section 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "1934 Act"). (Compl. (Docket Item 1) [hereinafter "Dkt."] at ¶¶ 12–17). Through its answer and amended counterclaim, Chariot Group asserts that any § 16(b) liability was extinguished by an agreement (the "Agreement") entered between Chariot Group and Synalloy in March 1991.

The Agreement was achieved by counsel for Chariot Group and counsel for Synalloy after extensive negotiations. (Pl. and Counterclaim Def.'s Br., Dkt. 30 at 2). Under the Agreement, Synalloy repurchased from Chariot Group a large block of Synalloy's common stock, at a price that was allegedly below the then-market price for such shares. (Am. Counterclaim, Dkt. 25 at ¶ 4). Pursuant to the Agreement the parties also agreed to a settlement of disputes *presently pending* between them. (Am. Counterclaim, Dkt. 25 at ¶ 3) (emphasis added). Consequently, defendants maintain the Agreement "settled and resolved the claims on which Synalloy now seeks to recover in this litigation." (Def. and Counterclaimant's Br., Dkt. 29 at 3). Synalloy responds, however, that Chariot Group's short swing profits resulted from a purchase of additional shares made known to Synalloy only *after* the Agreement was executed. Synalloy, therefore, argues that because "it goes without saying that the aggrieved party must be aware of a dispute for it to be 'presently pending'" (Pl. and Counterclaim Def.'s Br., Dkt. 30 at 3), the Agreement forgoing suit does not apply to Chariot Group's purchase of additional shares which was made known to Synalloy only after the Agreement was executed.

In the amended counterclaim, Chariot Group has specifically alleged: "In selling and transferring to plaintiff the shares referred to in the Agreement ... Chariot Group intended and understood that all liabilities, including those available under § 16(b), were settled and extinguished." (Am. Counterclaim, Dkt. 25 at ¶ 4). In paragraph six of the amended counterclaim, Chariot Group asserts: "Assuming that the claims asserted in plaintiff's Complaint were not settled and extinguished by the Agreement, there was no meeting of the minds between the parties with respect to the subject matter of the Agreement." (*Id.* at ¶ 6).

In paragraph 10 of the amended counterclaim, Chariot Group alleges,

plaintiff, at the time it entered into the Agreement, and at the time it consummated the Agreement by accepting transfer of the stock covered by the Agreement, knew or recklessly disregarded that Chariot Group understood the Agreement to include a settlement and extinguishment of plaintiff's § 16(b) claims asserted in the Complaint, but plaintiff intended to dishonor the Agreement by asserting its § 16(b) claims immediately after consummation of the Agreement. Plaintiff thus secured Chariot Group's entry into and performance under the Agreement by fraud, deceit and misrepresentation in connection with the purchase or sale of a security.

(Am. Counterclaim, Dkt. 25 at ¶ 10). In paragraph 9, Chariot Group alleges,

Had defendant Chariot Group been aware that plaintiff was intending to pre-

serve claims under § 16(b) at the time of the Agreement, Chariot Group would not have entered into the Agreement and transferred the stock to plaintiffs.

(*Id.* at ¶ 9). Finally, in paragraph 14, Chariot Group alleges that Synalloy fraudulently induced Chariot Group to enter into and perform under the Agreement. (*Id.* at ¶ 14).

Invoking the attorney-client privilege, Chariot Group refused to produce certain documents related to the amended counterclaim and requested by Synalloy. Synalloy, however, urges Chariot Group waived any attorney-client privilege by voluntarily injecting new issues into the case, the truthful resolution of which requires an examination of the confidential communications between attorney and client. Specifically, Synalloy has urged Chariot Group voluntarily injected the following issues into the case: (1) by asserting a "rescission" claim, Chariot Group placed at issue their understanding of the legal effect of the Agreement and whether that understanding was reasonable; and (2) by contending Synalloy knew, or recklessly disregarded, that Chariot Group understood the Agreement to include settlement of the asserted claims, but intended, nevertheless, to dishonor the Agreement, Chariot Group has put at issue the representations made by the parties, the meaning of those representations, and whether it was reasonable for the Chariot Group to rely on those representations. In so arguing, Synalloy notes that because Chariot Group's outside counsel negotiated the Agreement, all of the Chariot Group's knowledge about the negotiation of the Agreement necessarily came from that counsel.

## II.

The attorney-client privilege [1] is one of the oldest privileges known to common law. *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). "The privilege extends to communications from the attorney to the client, as well as reverse." *Pitney–Bowes, Inc. v. Mestre,* 86 F.R.D. 444, 446 (S.D.Fla.1980). "The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney." *Upjohn,* 449 U.S. at 395, 101 S.Ct. at 685. Indeed, the United States Supreme Court has observed:

> [T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney.

*Id.* at 395–96, 101 S.Ct. at 685–86 (quoting *Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962)).

Moreover, as recognized by this Court, "[i]t is essential that the communications between client and attorney concern legal assistance and advice in order to be privileged." *Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144 (D.Del.1977). Accordingly, "communications made in the routine course of business ... which disclose no privileged matters and which are devoid of legal advice or requests for such advice are not protected." *Id.* at 145. *See also In re Grand Jury Subpoena Duces Tecum Dat-*

---

1. As recognized by this Court, the attorney-client privilege applies only if:

"(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with the communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

*Hercules, Inc. v. Exxon Corp.,* 434 F.Supp. 136, 144 (D.Del.1977) (quoting *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass.1950)).

*ed September 15, 1983*, 731 F.2d 1032, 1037 (2d Cir.1984) ("[T]he privilege is triggered only by a client's request for legal, as contrasted with business, advice."); *Coleman v. American Broadcasting Cos., Inc.*, 106 F.R.D. 201, 205–206 (D.D.C.1985) ("Business and personal advice are not covered by the privilege."). Furthermore, the privilege does not protect facts which an attorney obtains from other sources and then conveys to his client. *See Hickman v. Taylor*, 329 U.S. 495, 508, 67 S.Ct. 385, 392, 91 L.Ed. 451 (1947).[2]

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interest in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389, 101 S.Ct. at 682; *see also United States v. Zolin*, 491 U.S. 554, 562, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989). However, "[b]ecause the attorney-client privilege obstructs the truth-finding process, it is construed narrowly." *Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1423 (3d Cir.1991). Moreover, "the attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *see also Clark v. United States*, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) (stating "[t]he privilege takes flight if the relation is abused."). "Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications." *Bilzerian*, 926 F.2d at 1292 (citing *United States v. Exxon Corp.*, 94 F.R.D. 246, 249 (D.D.C.1981) (claim of good faith reliance on governmental representations waived attorney-client privilege); *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975) (assertion of qualified immunity defense waived attorney-client privilege)); *see generally* Scott N. Stone & Ronald S. Liebman *Testimonial Privileges* § 1.50 at 83–84 (1983) [hereinafter *Testimonial Privileges* ] (stating the privilege may be waived "where the

party in the course of litigation raises an issue the effective rebuttal of which requires inquiry into privileged communications.").

The Court of Appeals for the Seventh Circuit has noted that "[t]o waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case." *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir.1987) (citing federal cases). In *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975), the Court articulated what is now an often-cited formulation of the doctrine of implied waiver:

> All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair. to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

*Id.* at 581.

The plaintiff in *Hearn*, a prison inmate, sued various State prison officials in their official capacities for alleged civil rights violations. The Court held that by invoking a defense of qualified immunity, the defendants impliedly waived any privilege it had with regard to information "germane" to the defense. *Id.* The Court reasoned, to deny plaintiff the privileged infor-

---

**2.** Some factual information may, however, be    entitled to work-product protection.

mation would be to deny him the "information necessary to 'defend' against defendants' affirmative defense." *Id.* In ultimately concluding that the benefit to be gained from disclosure outweighed the resulting injury to the attorney-client relationship, the Court noted plaintiffs' need "inextricably merged with the elements of plaintiff's case and defendant's affirmative defense." *Id.* at 582.

In *Conkling v. Turner,* 883 F.2d 431 (5th Cir.1989), the Court of Appeals for the Fifth Circuit quoted *Hearn* and noted, "[t]he great weight of authority holds that the attorney-client privilege is waived when a litigant 'place[s] information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would be manifestly unfair to the opposing party.'" *Id.* at 434 (quoting *Hearn v. Rhay,* 68 F.R.D. at 581). In *Conkling,* plaintiff claimed that a RICO statute of limitations period was tolled because plaintiff did not know of the false statement made by defendants until plaintiff was so informed by his attorney at a later date. Defendants, on the other hand, maintained that plaintiff had full knowledge of all facts underlying the alleged scheme prior to being so informed by his attorney. The Court of Appeals concluded, "[Plaintiff] has injected into this litigation the issue of when he knew or should have known of the falsity of [defendant's] assertion." *Id.* at 435. Accordingly, the court found a waiver of the attorney-client privilege and permitted defendants to depose plaintiff's attorneys on the issue of knowledge. *Id.*

In *Sedco Int'l. SA v. Cory,* 683 F.2d 1201 (8th Cir.1982), *cert. denied,* 459 U.S. 1017, 103 S.Ct. 379, 74 L.Ed.2d 512 (1982), plaintiff brought suit against defendant seeking final payment for use of its equipment and services. Defendant counterclaimed, maintaining that through fraudulent misrepresentations plaintiff induced defendant to enter into a venture to produce oil off the coast of Qatar. The Court of Appeals concluded that defendant's fraud claim waived defendant's right to assert the attorney-client privilege "to prevent disclosure of communications which might have proven [defendant] did not rely on [plaintiff] employee's statements or that such reliance was unreasonable." *Id.* at 1206.

Similarly, in this case Chariot Group, through its own affirmative action, injected the issue of fraudulent misrepresentation into the suit when it filed its amended counterclaim. Accordingly, Chariot Group waived its right to prevent disclosure of communications which might have proven Chariot Group did not rely on Synalloy's statements or that such reliance was unreasonable. Additionally, by claiming "rescission" of the Agreement due to "no meeting of the minds," Chariot Group waived its right to prevent disclosure of communications which might show the parties intent in entering the Agreements. *See Pitney–Bowes,* 86 F.R.D. 444 (concluding attorney-client privilege waived where the intent as to the terms of a contract are put at issue); *see generally Testimonial Privileges* § 1.50 at 72 n. 440 (Supp.1991).

One result of asserting the privilege has been to deprive Synalloy of the information necessary to 'defend' against the counterclaim. In this case, it was the attorneys who negotiated the Agreement. Because Chariot Group raised the issues of its lack of understanding of the Agreement and fraudulent misrepresentation, in circumstances in which perhaps the only people who would have explained the agreement to it were its attorneys, the Chariot Group's assertion in the counterclaim was an implicit waiver of the privilege.

Accordingly, an order will issue granting Synalloy's motion to compel.