1997-NMCA-032

937 P.2d 979

**Doyle HARTMAN and Margaret Hartman, d/b/a Doyle Hartman, Oil Operator, Plaintiffs–Appellees,**

v.

**TEXACO INC., a Delaware Corporation, and Texaco Exploration and Production Inc., a Delaware Corporation, Defendants–Appellants.**

No. 16328.

Court of Appeals of New Mexico.

Jan. 29, 1997.

Certiorari Denied March 7
and March 14, 1997.

Alice Tomlinson Lorenz, Marte D. Lightstone, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, Deborah G. Hankinson, Allison Roseman, Thompson & Knight, P.C., Dallas, TX, John D. Sullivan, Texaco Incorporated, Denver, CO, Eric D. Lanphere, Hinkle, Cox, Eaton, Coffield & Hensley, Albuquerque, for Appellants.

J.E. Gallegos, Michael J. Condon, Gallegos Law Firm, P.C., Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, for Appellees.

## OPINION

BOSSON, Judge.

1. Defendants Texaco Incorporated and Texaco Exploration and Production Incorporated appeal from the judgment entered against them after a jury verdict in favor of Plaintiffs Doyle and Margaret Hartman d/b/a Doyle Hartman Oil Operator on claims of common law trespass, statutory trespass, and intentional private nuisance. For convenience, we will refer to the Parties in the singular as Texaco and Hartman.

2. On appeal, Texaco argues: (1) that the trial court erred in ordering Texaco to produce certain documents during discovery; (2) that the trial court erred in admitting evidence of unrelated waterflows and of Texaco's post-accident conduct; (3) that the trial court erred in applying statutory trespass, NMSA 1978, § 30–14–1.1(D) (Repl. Pamp.1994), to this case and entering judgment for a figure that represents double damages; and (4) cumulative error. If the judgment is reversed, Hartman contends he should be allowed to try the issue of punitive damages which he raised in his pleadings and upon which discovery was predicated. See NMRA 1997, 12–201(C). In addition, two motions were filed during the pendency of this appeal that have not yet been resolved. We discuss those motions, along with our disposition of the evidentiary issues, in a separate memorandum opinion.

3. We hold that Section 30–14–1.1(D) does not apply to subsurface trespass, and therefore we reverse the imposition of double damages. We affirm the trial court on all other issues. Accordingly, we remand this case to the trial court with instructions to vacate the judgment and enter judgment in favor of Hartman in the amount determined by the jury. Because we are not remanding this matter for a new trial, we need not decide whether Hartman should be allowed to try the issue of punitive damages. Additionally, because we affirm the trial court's discovery and trial rulings, we reject Texaco's claim of cumulative error. See State v. Lopez, 105 N.M. 538, 548, 734 P.2d 778, 788 (Ct.App.1986) ("The doctrine of cumulative error has no application if no cumulative errors are committed and defendant has received a fair trial.").

## BACKGROUND

4. Doyle Hartman is an independent oil and gas operator who drills gas wells in Lea County, New Mexico. In January 1991, Hartman was drilling the Bates No. 2 well on property referred to as the Bates lease, when the drillers hit an uncontrolled, high pressure waterflow at a depth of 2281 feet, which is in the Salado formation.[1] After several round-the-clock days and several hundreds of thousands of dollars expended, as well as consultations with the New Mexico Oil Conservation Division and his own engineers, Hartman was forced to plug and abandon the well.

5. Hartman conducted an investigation into possible reasons for the blowout and came to the conclusion that the blowout was caused by injected water that had escaped from the Rhodes–Yates Unit (RYU), a water-flood operated by Texaco to recover oil from

---

1. Beneath the surface of the land are several formations or zones, each with distinct properties. Those most frequently mentioned in this opinion are the Salado, the Tansill, and the Yates. Of these formations, the Salado, a salt layer, is closest to the surface. Beneath the Salado lies the Tansill. Below the Tansill is the Yates formation, from which Texaco was taking oil.

the Yates formation.[2] In December 1992, Hartman met with Texaco employees and presented his theories concerning the cause of the blowout. In December 1993, Hartman filed suit against Texaco, alleging common law trespass, statutory trespass, and nuisance.

6. During discovery, Texaco resisted production of a number of its internal documents, contending that they were protected by the work product doctrine. Eventually, the trial court ordered most of these documents produced.

7. The trial took approximately two weeks. Hartman contended that Texaco injected water into its RYU injection wells at pressures sufficient to create vertical fractures in the Yates formation that extended through the Tansill and up to the Salado, that these high pressure injections went on for long periods of time, and that a substantial volume of the injected water was never recovered, indicating that it had escaped the formation and gone elsewhere—in Hartman's view, to the Bates lease area and into his well. Texaco, on the other hand, contended that it was physically impossible for the pressures it was using to create the vertical fractures necessary for water to escape from the Yates formation through the Tansill formation and into the Salado formation, and it was equally impossible for the water to travel 2½ miles through the Salado formation to the Bates lease. The jury returned a verdict in favor of Hartman on common law trespass, statutory trespass, and intentional private nuisance. During post-trial proceedings, the trial court determined that pursuant to Section 30–14–1.1(D), the portion of damages representing the appraised value of the damage to Hartman's property ($2,521,000) should be doubled. Judgment was entered accordingly, and this appeal followed.

*STATUTORY DOUBLE DAMAGES DO NOT APPLY TO SUBSURFACE TRESPASS*

8. Hartman claims he is entitled to double the appraised value of the property destroyed under Section 30–14–1.1(D) because Texaco committed a statutory trespass. Prior to trial, the district court indicated that it would instruct the jury on the statutory trespass claim, but would await post-verdict proceedings to decide whether subsection D applied. On appeal, Texaco argues that Section 30–14–1.1(D) does not apply to subsurface trespass. For the reasons discussed below, we agree.

9. Section 30–14–1.1 is entitled "Types of trespass; injury to realty; civil damages." It reads:

A. Any person who enters and remains on the lands of another after having been requested to leave is guilty of a misdemeanor.

B. Any person who enters upon the lands of another when such lands are posted against trespass at every roadway or apparent way of access is guilty of a misdemeanor.

C. Any person who drives a vehicle upon the lands of another except through a roadway or other apparent way of access, when such lands are fenced in any manner, is guilty of a misdemeanor.

D. In the event any person enters upon the lands of another without prior permission and injures, damages or destroys any part of the realty or its improvements, including buildings, structures, trees, shrubs or other natural features, he shall be liable to the owner, lessee or person in lawful possession for damages in an amount equal to double the amount of the appraised value of the damage of the property injured or destroyed.

10. The primary goal of statutory interpretation is to determine the intent of the legislature. *Edwards v. Board of County Comm'rs*, 119 N.M. 114, 117, 888 P.2d 996, 999 (Ct.App.1994). In making this determination, we look first to the plain language of the statute, giving the words their ordinary meaning unless a different meaning is indicated. *Id.* We think the language of the statute more likely indicates that the legislature intended Section 30–14–1.1(D) to apply

---

2. A waterflood operation is a secondary recovery operation in which water is injected under pressure from injection wells into the target zone or formation to allow for subsurface sweeping of water and oil within the target formation toward recovery wells.

to trespasses on the surface of the land by persons who enter another's land, as opposed to the type of subsurface trespass by a substance that is involved in this case. In its common usage "upon" means "on; upward so as to be on." *Webster's Third New International Dictionary, Unabridged* 2517 (Merriam–Webster, Inc. 1961). Additionally, Section 30–14–1.1(D), by its terms, protects things which are usually found on the surface of the land—buildings, structures, vegetation, or other natural features. While "other natural features" is certainly broad enough to include subsurface trespass, that is not the case if the phrase is read harmoniously with the more limited, specific protections in the same sentence ("buildings, structures, trees, shrubs or other natural features"). Under the rule of statutory construction, *ejusdem generis,* when the legislature recites specific examples followed by a general phrase, it is a fair presumption that the legislature intended the general language to be focused on the class of specific examples enumerated. *In re Melissa H.,* 105 N.M. 678, 679, 735 P.2d 1184, 1185 (Ct.App.1987); *Grafe v. Delgado,* 30 N.M. 150, 152, 228 P. 601, 602 (1924).

11. When we construe a statute, this Court considers the statute in its entirety. *Bustamante v. De Baca,* 119 N.M. 739, 742, 895 P.2d 261, 264 (Ct.App.1995). Subsection A of Section 30–14–1.1 deals with persons who enter and remain on land after being asked to leave. Subsection B concerns entry by persons onto lands posted against trespass at every roadway or apparent way of access. Subsection C deals with persons driving on lands of another except on a roadway when the lands are fenced. All of these events one would normally expect to occur on the surface of the land. Subsection D essentially creates a civil remedy for the preceding subsection. Viewing the language of subsection D in context with the rest of the section, Section 30–14–1.1 generally pertains to trespass by persons on the surface of the land, and subsection D provides compensation to landowners when a person enters the land without permission and damages the land or things on, or accessible from, the surface of the land.[3]

12. We also consider the history and background of Section 30–14–1.1. *See Edwards,* 119 N.M. at 117, 888 P.2d at 999. Section 30–14–1.1 was originally enacted in 1979. *See* 1979 N.M.Laws, ch. 186, § 2. The title of the Act when considered by the legislature was "Relating to trespass; amending, repealing and enacting certain sections of the NMSA 1978 to make certain entries onto land unlawful; prescribing penalties." Section 1 of the Act amended Section 30–14–1 and is not germane to our discussion. Section 2 of the Act enacted Section 30–14–1.1 as a new section of the New Mexico Statutes Annotated. We note that as enacted in 1979, subsections A, B, and C of Section 30–14–1.1 were declared to be petty misdemeanors; in all other respects, Section 30–14–1.1 as enacted in 1979 is identical to the present language of Section 30–14–1.1. Section 3 of Laws 1979, chapter 186, amended a different statute dealing with posting of no trespassing signs and prescribing a penalty for wrongful posting of public lands, and Section 4 of Laws 1979, chapter 186, repealed Sections 30–14–5 and 30–14–7, NMSA 1978 (being 1969 N.M.Laws, ch. 195, §§ 1 and 3).

13. The laws that were repealed in 1979 include the predecessor of Section 30–14–1.1(D). They concerned posting of real property with no trespassing signs and penalties for trespassing on posted property and are similar to the provisions of Laws 1979, Chapter 186, § 3. *See* 1969 N.M.Laws, ch. 195. In addition, Section 3 of Laws 1969, chapter 195, before its repeal in 1979, reads as follows:

---

**3.** Because of our ruling, we need not decide the issue raised by the parties of whether the double damages provision of Section 30–14–1.1(D) is strictly compensatory or is also punitive. *Compare Hale v. Basin Motor Co.,* 110 N.M. 314, 320, 795 P.2d 1006, 1012 (1990) (observing, in dicta, that statutory multiplication of damages is a form of punitive damages, while holding that a person could not recover both treble damages under NMSA 1978, Section 57–12–10(B) and punitive damages based on the same conduct) *with Ventoza v. Anderson,* 14 Wash.App. 882, 545 P.2d 1219, 1227–28 (expressing the view that a treble damages provision is meant to compensate the landowner for intangible damages and damages that are difficult to quantify), *review denied,* 87 Wash.2d 1007 (1976).

### Section 3. PENALTY—DOUBLE DAMAGES FOR INJURY TO REALTY.—

A. It shall be a petty misdemeanor for any person to enter upon or trespass on any real property posted in accordance with Section 2 of the Property Posting Act without the permission of the owner, lessee, person in lawful possession or his agent.

B. In the event any person enters upon the lands of another in violation of the Property Posting Act and injures or destroys any part of the realty or its improvements, including buildings, structures, trees, shrubs, or other natural features, he shall be liable to the owner, lessee or person in lawful possession for damages in an amount equal to double the amount of the appraised value of the property injured or destroyed.

C. It is a petty misdemeanor for any person other than the owner, lessee or person lawfully in possession, or his agent, to post property.

Thus, the 1979 Act was apparently an effort to integrate the laws relating to posting of property and the civil and criminal remedies for trespass to real property, including the provision for double damages. The concern of the legislature was directed to persons trespassing on the surface of the land and damaging features found on, or accessible from, the surface of the land.

14. In 1983, Section 30–14–1 and Section 30–14–1.1 were again amended. *See* 1983 N.M.Laws, ch. 27. The title of the 1983 Act was "Relating to Game and Fish; Authorizing Enforcement of Law by Conservation Officers; Defining Criminal Trespass; Providing a Penalty; Amending Certain Sections of the NMSA 1978." In addition to its provisions relating to the enforcement of game laws and increased authority of conservation officers, the 1983 amendment made violations of subsections A, B, and C of Section 30–14–1.1 misdemeanors rather than petty misdemeanors. Subsection D was reenacted without change, and it has remained the same since then. There has been no express expansion of the statute to address additional kinds of trespass. Therefore, our survey of the contextual landscape leads us to conclude that the legislative focus was directed toward surface trespass and not the kind of subsurface intrusion that occurred in this case.

■ 15. Hartman also argues that under common law a trespass could occur beneath the surface of the land, and therefore this Court should interpret Section 30–14–1.1(D) in a manner consistent with the common law. We recognize that in New Mexico an action for common law trespass does provide relief for trespass beneath the surface of the land. *See Schwartzman Inc. v. Atchison, Topeka & S.F. Ry.,* 857 F.Supp. 838, 844 (D.N.M. 1994) (trespass for pollution of groundwater); *see also Lincoln–Lucky & Lee Mining Co. v. Hendry,* 9 N.M. 149, 155, 50 P. 330, 332 (1897) (subsurface trespass by mining shaft). *See generally* Restatement (Second) of Torts § 159 (1965). We further recognize that "a court will not find the common law superseded unless it appears that it was the legislative intent, which is to be determined primarily by the language of the statute itself." *Duncan v. Henington,* 114 N.M. 100, 102, 835 P.2d 816, 818 (1992) (citing *State ex rel. Stratton v. Roswell Indep. Schs.,* 111 N.M. 495, 500, 806 P.2d 1085, 1090 (Ct.App.1991)); *see also State v. Gabehart,* 114 N.M. 183, 185, 836 P.2d 102, 104 (Ct.App.1992) (implied repeals of common law are disfavored). However, throughout these proceedings the parties have treated Hartman's claims for common law trespass and statutory trespass as two distinct claims. Texaco does not challenge the legal efficacy of Hartman's claim for common law trespass, and we do not disturb it on appeal. Rather than limiting or abolishing a right that existed under the common law, Section 30–14–1.1(D) provides an additional remedy in certain statutorily defined circumstances. Those circumstances are not necessarily as expansive as the full reach of the common law. The legislature in its wisdom may focus on only certain kinds of trespass for purposes of enhancing damages.

16. In summary, the language of the statute, the titles of the acts when they were under legislative consideration, and the history of legislation on the subject, all indicate that the legislature was most likely con-

cerned with trespass by persons on the surface of the land resulting in damage to the land itself or to features on or accessible from the surface of the land, such as buildings or vegetation. Nothing in the statute indicates that the legislature envisioned applying Section 30–14–1.1(D) to a subsurface trespass by injected water, even if the trespass was ultimately attributable to the actions of a person on the surface. In the absence of any indication that the legislature intended Section 30–14–1.1(D) to apply to trespass by substances beneath the surface of the land, we hold that Section 30–14–1.1(D) does not apply to such a trespass.

17. Finally, we are aware that in New Mexico oil conservation is carefully regulated by statute and administrative procedure. *See, e.g.,* NMSA 1978, §§ 70–2–1 to –38 (Repl.Pamp.1995 & Supp.1996) (Oil and Gas Act creating Oil Conservation Commission); *Continental Oil Co. v. Oil Conservation Comm'n,* 70 N.M. 310, 373 P.2d 809 (1962). Among other objectives, those regulations are specifically directed at waterflood operations and their impact upon oil conservation as it affects the public interest. *See* § 70–2–12(B)(4), (7), (14), (15). This is an area of paramount public concern where the legislature and the appropriate administrative agency have spoken in some detail. We are hesitant to apply a generic statutory trespass statute in a manner that might create unforeseen and unintended consequences upon these public regulatory concerns, at least not without more evidence than we have before us of a legislative intent to do so. We recognize that our Supreme Court has indicated that a landowner whose property is damaged by injected water used in oil and gas operations has a claim for damages caused by the trespass. *See Snyder Ranches, Inc. v. Oil Conservation Comm'n,* 110 N.M. 637, 640, 798 P.2d 587, 590 (1990). We do not believe our decision today is inconsistent with that case.

*WORK PRODUCT PROTECTION*

■ 18. There are no reported New Mexico decisions which conclusively resolve the work product discovery issues raised in this appeal. Cases addressing discovery and specifically NMRA 1997, 1–026, have deter-

mined that the rules intend liberal pretrial discovery. *Marchiondo v. Brown,* 98 N.M. 394, 397, 649 P.2d 462, 465 (1982); *Richards v. Upjohn,* 95 N.M. 675, 681, 625 P.2d 1192, 1198 (Ct.App.1980). There is a presumption in favor of discovery. *Marchiondo,* 98 N.M. at 397, 649 P.2d at 465.

■ 19. The work product rule is not a privilege, but an immunity protecting from discovery documents and tangible things prepared by a party or its representative in anticipation of litigation. NMRA 1–026(B)(4); *Diamond State Ins. Co. v. Rebel Oil Co.,* 157 F.R.D. 691, 698 (D.Nev.1994). The rule provides nearly absolute immunity for "opinion" work product, i.e., documents which reflect an attorney's mental impressions, conclusions, opinions or legal theories and a qualified immunity for all other "non-opinion" work product. *See Diamond State Ins. Co.,* 157 F.R.D. at 699. *See generally* Edna S. Epstein & Michael M. Martin, *The Attorney–Client Privilege and the Work Product Doctrine,* 102–08 (American Bar Association, 2d ed. 1989) (Epstein & Martin). Texaco concedes that the disputed documents are not opinion work product. Our focus then, is whether the documents are entitled to qualified immunity as non-opinion work product.

■ 20. We note first that the standard of review for discovery orders is abuse of discretion. *Church's Fried Chicken No. 1040 v. Hanson,* 114 N.M. 730, 733, 845 P.2d 824, 827 (Ct.App.1992); *DeTevis v. Aragon,* 104 N.M. 793, 797–98, 727 P.2d 558, 562–63 (Ct. App.1986). The party asserting the work product immunity under NMRA 1–026(B)(4) bears the burden of establishing for each document that the rule applies. *See Hartman v. El Paso Natural Gas Co.,* 107 N.M. 679, 686–87, 763 P.2d 1144, 1151–52 (1988). This burden may be met by submitting detailed affidavits *sufficient to show that precise facts exist to support the immunity claim.* *Diamond State Ins. Co.,* 157 F.R.D. at 699 (emphasis added) (citing *Harvey's Wagon Wheel, Inc. v. N.L.R.B.,* 550 F.2d 1139, 1141 (9th Cir.1976)).

■ 21. The critical issue in this case is whether Texaco sustained its burden of dem-

onstrating that the disputed documents were prepared "in anticipation of litigation or for trial" within the meaning of NMRA 1–026(B)(4). The courts have not found a "neat general formula" to determine whether documents were prepared in anticipation of litigation. *Diamond State Ins. Co.*, 157 F.R.D. at 699. *See generally* Epstein & Martin, *supra*, at 118. The party with the burden of persuasion must demonstrate that litigation was "the driving force" behind the preparation of each challenged document. *Diamond State Ins. Co.*, 157 F.R.D. at 699. The federal courts have treated the question of whether documents were prepared in anticipation of litigation as strongly dependent on the facts of a particular case. *See, e.g., Binks Mfg. Co. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118–20 (7th Cir.1983); *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 352 (D.Conn.1991).

22. Some courts also look to the extent legal counsel was involved in the preparation of the documents or in their supervision. *See Colorado ex rel. Woodard v. Schmidt–Tiago Constr. Co.*, 108 F.R.D. 731, 734 (D.Colo.1985); *APL Corp. v. Aetna Casualty & Sur. Co.*, 91 F.R.D. 10, 16–17 (D.Md.1980). Courts recognize that not all documents are prepared in anticipation of litigation, even though ultimately they may end up being used in litigation. Instead, they may be prepared during the course of ordinary investigations or in the ordinary course of business. *See, e.g., Binks Mfg. Co.*, 709 F.2d at 1118–19; *In re Grand Jury Subpoena*, 599 F.2d 504, 510–11 (2d Cir.1979); *Pacamor Bearings, Inc. v. Minebea Co.*, 918 F.Supp. 491, 513–14 (D.N.H.1996).

23. Sometimes there may be more than one motive for the preparation of a document which moves a court to speak of requiring that litigation be a primary or principal motive, or even the exclusive motive, behind its preparation. *See Sandberg v. Virginia Bankshares, Inc.*, 979 F.2d 332, 356 (4th Cir.1992), *vacated,* 1993 WL 524680 (1993); *Maloney v. Sisters of Charity Hosp.*, 165 F.R.D. 26, 30 (W.D.N.Y.1995); *Cameron v. General Motors Corp.*, 158 F.R.D. 581, 589 (D.S.C.1994); *Stout v. Illinois Farmers Ins. Co,* 150 F.R.D. 594, 597 (S.D.Ind.1993).

Some courts require that the thrust of litigation must have progressed to the point where the movant can demonstrate that the document was prepared pursuant to "an identifiable resolve to litigate." *Binks Mfg. Co.*, 709 F.2d at 1119 (quoting *Janicker v. George Washington University,* 94 F.R.D. 648, 650 (D.D.C.1982)); *accord Stout,* 150 F.R.D. at 600. We note one formulation of the test set forth in an often-cited treatise:

> the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation. But the converse of this is that even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

8 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2024, at 343–46 (2d ed. 1994) (footnotes omitted).

24. In this case the documents in dispute were primarily graphs, maps, charts, spreadsheets, data reports and similar kinds of exhibits pertaining generally to waterflood and well production information. Texaco argues that the disputed documents were prepared in anticipation of litigation. In support, Texaco filed affidavits regarding the waterflood operation from three employees who helped prepare the documents. These affidavits do not show the precise facts necessary to support the immunity claim. The three affidavits are conclusory in form, self-serving, and lack detailed foundations for their conclusions. For example, the affidavit of Mark Wilkins states that once Texaco was aware of the blowout at Bates No. 2 and Hartman's administrative protest of Texaco's application to expand the RYU (a date not precisely established in the affidavit), Texaco knew there was a "very good possibility" that there would be litigation over the blowout. In addition, the affidavit indicates globally that the disputed documents were "prepared or gathered in response to the claims made by Doyle Hartman, *or* in preparation for Texaco's hearing before the New Mexico Oil Conservation Division for approval of the

Rhodes waterflood applications, *or* the present lawsuit filed by Doyle Hartman[.]" (Emphasis added.) The affidavit further asserts generally, for each disputed document, that it was "compiled, created, and studied in anticipation of an administrative hearing before the New Mexico Oil Conservation Division (NMOCD) or the New Mexico Oil Conservation Commission (NMOCC) in response to the protest made by Doyle Hartman to Texaco's Rhodes Waterflood Applications Nos. 10572 and 10573 and in anticipation of the present lawsuit." The two other affidavits are similar, except that they refer only to the administrative protest filed by Hartman, and indicate that each employee "prepared or created [the documents] because of the actions taken by Doyle Hartman during the processing period of Texaco's application to expand the Rhodes waterflood and the subsequent litigation that followed."

25. Along with these three affidavits, the district court had before it an affidavit from Hartman's expert which stated that these graphs, maps, charts, spreadsheets, and statistical reports were of the type typically created by the operator of a waterflood project in the ordinary course of business. We note also that neither the pleadings nor these affidavits indicate that the disputed documents were prepared pursuant to the request, direction, or supervision of legal counsel. Furthermore, other documents which did indicate facially the involvement of legal counsel were ordered *not* produced. Texaco had the burden of establishing, for each document, the rule's application. In reviewing the record, including these vague and conclusory affidavits and the testimony presented

below, we cannot say the trial court abused its discretion when it ordered production of the disputed documents.[4]

## OTHER ISSUES

26. In a separate memorandum opinion, we discuss Texaco's evidentiary issues as well as the parties' motions pertaining to the record on appeal. Part of that discussion concerns the manner in which Texaco presented portions of its appeal to this Court. We make reference to that discussion hereafter for the purpose of clarifying our appellate rules regarding requirements for briefs submitted to this Court.

■ 27. The appellate rules are designed, among other things, to obtain briefs that provide this Court with an organized, accurate statement of the material necessary to consider the issues raised on appeal without reference to extraneous matters. *Allen v. Williams,* 77 N.M. 189, 190, 420 P.2d 774, 775 (1966). A one-sided statement of the facts is no help to this Court. *See, e.g., Martinez v. Southwest Landfills, Inc.,* 115 N.M. 181, 184, 848 P.2d 1108, 1111 (Ct.App. 1993); *Perfetti v. McGhan Medical,* 99 N.M. 645, 654, 662 P.2d 646, 655 (Ct.App.1983).

28. While it is true that our admonitions against one-sided statements of the facts probably pertain most often to briefs challenging the sufficiency of the evidence, many other issues also involve appellate consideration of the facts or factual determinations by the trial court which must begin with a balanced presentation of the factual record. In this case for example, both the work product issue and Texaco's evidentiary issues involve factual determinations by the trial

---

4. We have not overlooked the fact that, during trial, the trial court sustained Texaco's objection to the admission into evidence of one document on the ground that the document was covered by the work product privilege and should not have been produced. At the time the trial court made its ruling, Texaco did not ask for any additional relief based on the erroneous production of this document. On appeal, Texaco contends that production of the document provided Hartman's expert witness with a "road map" of its case and was so highly prejudicial, even though it was not shown to the jury, that this Court should reverse and remand for a new trial. However, the document in question was produced quite some time after Hartman's expert witness had been deposed

and less than a week before trial. The document was not admitted into evidence, and Texaco had ample opportunity to cross-examine the expert concerning any alleged changes in the views previously expressed in his deposition. Under these circumstances, we think Texaco's assertions of prejudice are at best speculative and do not warrant a new trial on the basis of one document. *See State v. Hoxsie,* 101 N.M. 7, 10, 677 P.2d 620, 623 (1984) ("An assertion of prejudice is not a showing of prejudice. In the absence of prejudice, there is no reversible error.") (citations omitted), *overruled on other grounds Gallegos v. Citizens Ins. Agency,* 108 N.M. 722, 731, 779 P.2d 99, 108 (1989).

court which cannot be reviewed effectively on appeal with a one-sided version of the facts. Indeed we note that the rule of appellate procedure that requires "a summary of the facts relevant to the issues presented for review," along with references to the record, is not restricted to challenges to the sufficiency of the evidence. NMRA 1997, 12–213(A)(2).

■ 29. This Court was not provided with everything it needed to resolve the evidentiary or discovery issues presented on appeal. For example, Texaco objected to the admission of certain evidence on grounds of relevancy. What is relevant depends on the facts that are at issue in the proceeding and the purpose for which evidence is offered. To evaluate issues like these properly this Court needs: (1) a description of the evidence at issue; (2) an explanation of the purpose for which the evidence was offered; (3) the arguments made in the trial court in favor of and against the admission of the evidence; and (4) the trial court's ruling and, if stated by the trial court, the basis for the ruling. We expect appellate counsel to provide us with this information as a condition to raising evidentiary challenges on appeal. In addition, if the Court is persuaded that the trial court committed error in the admission or exclusion of evidence, this Court must still determine whether the error was harmless or prejudicial. This in turn requires an understanding of all the evidence submitted at trial, so that the prejudice or lack of it may be assessed. *See City of Santa Fe v. Komis,* 114 N.M. 659, 664, 845 P.2d 753, 758 (1992).

## CONCLUSION

30. We reject all of Texaco's claims of error relating to pretrial and trial proceedings. We affirm the jury's verdict in favor of Hartman. We hold that Section 30–14–1.1(D) does not apply to this case, and therefore the trial court erred in entering judgment for double the amount of the appraised value of the damage to the property. Because the only error on appeal can be corrected by entry of a new judgment, without a new trial, we need not reach Hartman's claim for punitive damages. Accordingly, we remand this matter to the trial court with instructions to enter judgment in favor of Hartman and against Texaco in the amount awarded Hartman by the jury.

31. IT IS SO ORDERED.

ALARID and BUSTAMANTE, JJ., concur.