10 P.3d 166

2000-NMCA-077

**PUBLIC SERVICE COMPANY OF NEW MEXICO and Mellon Bank, N.A., Trustee of the Public Service Company of New Mexico Master Decommissioning Trust, Plaintiffs–Appellants,**

v.

**John LYONS, et al., Defendants–Appellees.**

**No. 20,575.**

Court of Appeals of New Mexico.

June 22, 2000.

David G. Campbell, Osborn Maledon, P.A., Phoenix, Arizona, James O. Browning, Charles R. Peifer, Browning & Peifer, P.A., Albuquerque, NM, for Appellant Mellon Bank, N.A., Trustee.

David F. Cunningham, Kevin V. Reilly, White, Koch, Kelly & McCarthy, P.A., Santa Fe, NM, for Appellant Public Service Company of New Mexico.

John W. Boyd, Freedman, Boyd, Daniels, Hollander, Goldberg & Cline, P.A., Albuquerque, NM, Richard A. Rosen, Ronald P. Replogle, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, for Appellee The Equitable Life Assurance Society of the United States.

Mel E. Yost, Christopher M. Grimmer, Scheuer, Yost & Patterson, P.C., Santa Fe, NM, for Appellee Lloyd Williams.

Jeffrey A. Brannen, Wesley G. Handy, Comeau, Maldegen, Templeman & Indall, L.L.P., Santa Fe, NM, for Appellee Kidder Peabody & Co., Inc.

John M. Eaves, Eaves, Bardacke & Baugh, Albuquerque, NM, David H. Paige, Nicoletti, Hornig & Sweeney, New York, NY, for Appellee John Lyons, Financial Marketing Services, Inc. and COMReP, Inc.

Lyman G. Sandy, Miller, Stratvert, Torgerson & Schlenker, Albuquerque, NM, Vaughn C. Williams, Skaaden, Arps, Slate, et al., New York, NY, Alan R. Fridkin, Springfield, MA, for Appellee Massachusetts Mutual Life Insurance Co. and Connecticut Mutual Life Insurance Co.

Luis G. Stelzner, Robert P. Warburton, Sheehan, Sheehan & Stelzner, Albuquerque, NM, for Appellee Bernard Spereman.

Marshall G. Martin, Stanley Kotovsky, Jr., Hinkle, Cox, Eaton, Coffield & Hensley,

L.L.P., Albuquerque, NM, for Appellee General American Life Insurance Co.

Rex D. Throckmorton, Charles K. Purcell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, Donald Wall, Squire Sanders & Dempsey, Phoenix, AZ, for Appellee New England Mutual Life Insurance Co. and Metropolitan Life Insurance Co.

William C. Madison, Madison, Harbour & Mroz, Albuquerque, NM, Ralph B. Levy, Daniel R. King, King & Spalding, Atlanta, GA, for Appellee Towers, Perrin, Forster & Crosby, Inc.

John B. Pound, Herrera, Long & Pound, P.A., Santa Fe, NM, Frank B. Vanker, Richard D. Bernstein, Sidley & Austin, Chicago, IL, for Appellee Deloitte & Touche USA LLP.

Norman S. Thayer, Sutin, Thayer & Browne, Albuquerque, NM, Edward G. Warin, McGrath, North, Mullin & Kratz, P.C., Omaha, NE, for Appellee Kutak Rock & P. Thomas Pogge.

## OPINION

APODACA, Judge.

{1} In this interlocutory appeal, Public Service Company of New Mexico (PNM) and Mellon Bank (Bank) challenge the trial court's order concerning discovery requested by Defendants of various documents in Plaintiffs' possession. The court's order determined that Plaintiffs had implicitly waived their attorney-client privilege and work product protection by affirmatively pleading fraudulent concealment, equitable tolling, and equitable estoppel as pled in Plaintiffs' first amended complaint in anticipation of Defendant raising a statute of limitations defense. Specifically, we consider Plaintiffs' claim that they never made any offensive or direct use (as opposed to defensive or passive use) of protected information and therefore should not be deemed to have waived their attorney-client privilege or work product protection. We agree with Plaintiffs that no waiver of the attorney-client privilege has occurred at this juncture in the litigation. We therefore reverse the trial court on the issue of the attorney-client privilege and remand for further proceedings.

{2} Based on our review of the record and the parties' briefs, the work product protection issue was essentially subsumed in the trial court as part of the attorney-client waiver issue. We thus limit our discussion to the attorney-client privilege issue and instruct the trial court on remand to address any independent work product protection issue under Rule 1–026 NMRA 2000.

## I. FACTUAL AND PROCEDURAL BACKGROUND

{3} PNM, a public utility company, is partial owner of the Palo Verde Nuclear Generating Station located in Maricopa County, Arizona. The company is required by federal regulations to assure that there will be sufficient funds to decommission the three units of the plant when those units have reached the end of their useful lives. In 1986, estimates projected that PNM would need to assure the availability of $500 million for its share of decommission costs in the years 2024, 2025, and 2027.

{4} On July 31, 1987, PNM created a settlor-directed, revocable trust to meet its decommissioning obligations. Bank is trustee of the decommissioning trust. The corpus of the trust was invested in a corporate-owned life insurance (COLI) program called the Cost of Money Reduction Program (COMReP). COLI programs are designed to provide tax-free money to fund corporate obligations by using life insurance policies to insure corporate employees. Between 1987 and 1988, PNM used the decommissioning trust corpus to purchase 1729 life insurance policies issued by a number of Defendants and their predecessors.

{5} Plaintiffs have alleged in their amended complaint that these investments were made based on representations from numerous Defendants that the returns would be sufficient to satisfy PNM's decommissioning obligations under federal law. Plaintiffs have also alleged that the complexity of the COMReP insurance investment scheme made it necessary to rely on Defendants for their expertise in monitoring and evaluating the program relating to PNM's funding obligations. Plaintiffs later discovered that the

COMReP insurance investment scheme would not yield sufficient funds for PNM to meet its future obligations. Plaintiffs place the blame on various alleged misrepresentations, material omissions, and other improper conduct on the part of Defendants. Plaintiffs claim that they first discovered the alleged improper conduct and breaches in 1997 after hiring a consultant to review the program. By the end of 1997, Plaintiffs had invested almost $19 million in cash into the COMReP program, but their investment allegedly had a surrender value after taxes of only $13.4 million in 1998. Plaintiffs' complaint alleged that this difference would have left the trust short of the decommissioning obligations by some $372 million in date-of-license expiration dollars.

{6} Plaintiffs sued Defendants under numerous theories. Their original complaint was filed on March 31, 1998. Plaintiffs' theories included fraud, constructive fraud, deceptive insurance practices under NMSA 1978, Section 59A–16–30 (1990), unfair trade practices under NMSA 1978, Section 57–12–10 (1987), breach of contract, breach of fiduciary duty, negligence, negligent misrepresentation, and promissory estoppel.

{7} By the end of April 1999, Plaintiffs had produced 70,000 pages of documents in the lawsuit. They also submitted a log book of documents they claimed were protected by the attorney-client privilege and the work product doctrine. Defendants responded by filing a motion to compel production of documents relevant to Plaintiffs' assertion that they did not discover the alleged improper conduct until 1997. Defendants based their motion on the argument that, "by claiming equitable tolling based on prior ignorance of its claims, a plaintiff waives attorney-client privilege and work product protection for any communications whose contents may shed light on whether the plaintiff is or is not being truthful about its ignorance." At the hearing on the motion, Defendants presented their argument on the assumption that, for purposes of the trial court's ruling on their motion, the documents in question were in fact privileged or otherwise protected.

{8} The trial court granted Defendants' motion, ruling that:

PNM, by asserting claims of fraudulent concealment, equitable estoppel, and equitable tolling in the First Amended Complaint, in order to avoid statutory limitations, implicitly waived the attorney-client privilege and the protection of the work product doctrine as to its and its attorneys' knowledge, documents and communications from January 1, 1985 through May 2, 1997[,] which relate to the issues of fraudulent concealment, equitable tolling, or equitable estoppel as pled in Plaintiffs' First Amended Complaint.

{9} The trial court characterized any documents pertaining to Plaintiffs' knowledge as relevant and vital to the disposition of the statute of limitations issue. On this basis, the trial court ordered a special master appointed for discovery purposes to review the documents listed in the privilege log and to submit a report to the court on any documents satisfying the court's definition of relevancy. Plaintiffs filed an application for interlocutory appeal from this order. This Court granted the application and assigned the case to our general calendar. Uncertain whether or not the underlying order was subject to Rule 12–503 NMRA 2000, allowing direct appeals from collateral orders, Plaintiffs also filed a petition for writ of error. This Court granted the petition and consolidated the appeals without resolving the appropriate procedure for seeking appellate review of the trial court's order. The parties have since informed this Court that, after the docketing of this appeal, the special master provided the trial court with a list of documents believed to satisfy the court's criteria for production. We should note, however, that any order requiring production has been stayed by the trial court pending disposition of this appeal.

## II. DISCUSSION

### A. Standard of Review

{10} As a general matter, we review discovery orders for abuses of discretion. *See Hartman v. Texaco*, 1997–NMCA–032, ¶ 20, 123 N.M. 220, 937 P.2d 979. In this appeal, however, the question presented requires our review of the trial court's con-

struction of law regarding privileges; as such, it presents a legal question that we review de novo. *See New Mexico Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450.

## B. New Mexico's Rules of Privilege and Abrogation of Common Law

{11} In *Ammerman v. Hubbard Broadcasting, Inc.,* 89 N.M. 307, 551 P.2d 1354 (1976), our Supreme Court held that rules of privilege, being evidentiary and thus procedural in nature, were constitutionally the domain of the judiciary. *Id.* at 310, 551 P.2d at 1357. On that basis, the Court concluded that statutory privileges created by the legislature were unconstitutional. *Id.* at 311, 551 P.2d at 1357. This approach is reflected in Rule 11–501 NMRA 2000, limiting privileges to those required by the state constitution and the rules promulgated by the Supreme Court. *See Ammerman,* 89 N.M. at 312, 551 P.2d at 1359 (discussing the limited privileges under Rule 501).

{12} New Mexico's approach to privileges is a special product of our state law jurisprudence. For example, Federal Rule of Evidence 501, from which our own rule is derived, expressly authorizes lower courts to continue developing and recognizing privileges. *See* 3 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 501.10[3], at 501–16 (Joseph M. McLaughlin, ed., 2d ed.2000). New Mexico, however, does not follow that approach. As our Supreme Court noted since its decision in *Ammerman,* Rule 11–501 prohibits New Mexico courts from engaging in such ad hoc expansion:

> The fact that New Mexico did not follow the approach of Congress but instead limited the privileges available to those recognized by the Constitution, the Rules of Evidence, or other rules of this Court manifests the abrogation and inapplicability of the common law evidentiary privileges.

*State ex rel. Attorney General v. First Judicial Dist. Court,* 96 N.M. 254, 260, 629 P.2d 330, 336 (1981). In *First Judicial,* the Court rejected the state's contention that a "public interest privilege" could be based, inter alia, on common law evidentiary privileges. *Id.*

{13} For these reasons, we are bound by the privileges expressly stated in Rule 11–502 NMRA 2000 (required reports privileged by statute), Rule 11–503 NMRA 2000 (attorney-client privilege), Rule 11–504 NMRA 2000 (physician-patient and psychotherapist-patient privilege), Rule 11–505 NMRA 2000 (husband-wife privileges), Rule 11–506 NMRA 2000 (communications to clergy), Rule 11–507 NMRA 2000 (political vote), Rule 11–508 NMRA 2000 (trade secrets), Rule 11–509 NMRA 2000 (communications to juvenile probation officers and social service workers), Rule 11–510 NMRA 2000 (identity of informer), and Rule 11–514 NMRA 2000 (news media). In this appeal, we are concerned only with the attorney-client privilege.

{14} Rule 11–503(D) sets forth the following exceptions to the attorney-client privilege: (1) furtherance of crime or fraud, (2) claimants through same deceased client, (3) breach of duty by lawyer or client, (4) document attested by lawyer, and (5) joint clients. None of these exceptions apply to the present case. Rule 11–511 NMRA 2000, however, states the following guidelines for waiver of privilege by voluntary disclosure:

> A person upon whom these rules confer a privilege against disclosure of the confidential matter or communication waives the privilege if the person or person's predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication. This rule does not apply if the disclosure is itself a privileged communication.

Rule 11–511. This provision is consistent with the general view that a person can be found to have waived a privilege or statutory right. *See Moss Theatres, Inc. v. Turner,* 94 N.M. 742, 744, 616 P.2d 1127, 1129 (Ct.App. 1980). The principle of waiver underlying Rule 11–511, however, raises an important question in light of our Supreme Court's holding in *First Judicial:* If we are rule-bound concerning the recognition of specific privileges and waiver, should our courts engage in the type of ad hoc judicial waiver analysis engaged in by other courts that are

free to apply the common law? For the reasons that follow, in view of the absence of a specific rule governing the at-issue waiver of the kind advocated by Defendants and discussed below, we hold that our courts must adhere closely to waiver as defined in Rule 11–511 and are not free to engage in ad hoc rule-making and waiver analysis as requested by Defendants.

## C. The At–Issue Waiver Doctrine

{15} A person who places privileged matters "at-issue" in the litigation can be said to have implicitly consented to disclosure. *See generally Weinstein's Federal Evidence* §§ 503.41 and 511.05. As one commentator has observed: "When the client crosses the threshold and affirmatively raises an issue, either by way of a claim, counterclaim or affirmative defense that effectively can be disproven only through confidential attorney-client communications, courts are in conflict over whether the act of injecting that issue waives the protection of the attorney-client privilege." 2 Paul R. Rice, *Attorney–Client Privilege in the United States*, § 9:50 at 210–211 (2d. Ed.1999). The impressive array of cases in the parties' briefs in this appeal reflects the conflict taking place in the federal and state courts that have addressed the at-issue doctrine. Despite the factual and legal complexity that these cases present, they fall into one of three categories or approaches for application of what we shall term as the at-issue waiver doctrine. As explained by the Tenth Circuit:

> Courts generally employ some version of one of the three following general approaches to determine whether a litigant has waived the attorney-client privilege. The first of these general approaches is the "automatic waiver" rule, which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant. The second set of generalized approaches provides that the privilege is waived only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case. Finally,

several courts have recently concluded that a litigant waives the attorney-client privilege if, and only if, the litigant directly puts the attorney's advice at issue in the litigation.

*Frontier Refining, Inc. v. Gorman–Rupp Co., Inc.*, 136 F.3d 695, 699–700 (10th Cir. 1998) (citations omitted). Some courts and commentators occasionally refer to the various tests differently. *See, e.g.*, T. Maxfield Bahner and Michael L. Gallion, *Waiver of Attorney-client Privilege via Issue Injection: A Call for Uniformity*, 65 Def. Couns. Journ. 199, 201–04 (1998) (separating cases into four categories). We believe, however, that it is most helpful to limit the cases to the three categories or approaches described by the Tenth Circuit court in *Frontier Refining*.

{16} In considering these three approaches, courts have the option of choosing between two straightforward tests (Approaches 1 and 3, as listed in *Frontier Refining*) and a middle of the road, case-by-case fairness test (Approach 2). At the one extreme (Approach 1), the automatic waiver rule offers simplicity because a court only needs to look to the claim, counterclaim, or defense to see if it makes privileged matters relevant. This approach has been severely criticized as too rigid and has been adopted in only a handful of cases. *See Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 593–94 (D.Mass.1979); *Compagnie Francaise d'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 25 n. 2 (S.D.N.Y.1984); *Independent Prods. Corp. v. Loew's Inc.*, 22 F.R.D. 266, 277 (S.D.N.Y.1958); *Federal Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co.*, 53 F.R.D. 260, 262 (W.D.Okla.1971).

{17} The intermediate approach (Approach 2) is generally referred to as the *Hearn* test because it was first articulated in *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash.1975). *See Weinstein's Federal Evidence* § 503.41 at 503–104.1. That case involved a prisoner who filed a civil rights action against prison officials after being confined in the prison's mental health unit. The defendants raised the defense of qualified immunity, thereby placing the legal advice they received directly at issue in the case. *Id.* The court in *Hearn*

adopted fairness as a guiding principle and set forth a three-part inquiry to determine whether the attorney-client privilege had been waived:

All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

*Id.*

{18} The approach taken in *Hearn* represents the majority view. *See* Rice, *Attorney-client Privilege in the United States* at § 9:50 at 224–25 ("While *Hearn* has not been without its detractors, the court's logic has received overwhelming support in the courts that have addressed the issue."); *see generally Synalloy Corp. v. Gray,* 142 F.R.D. 266, 269 (D.Del.1992); *Pyramid Controls, Inc. v. Siemens Indus. Automations, Inc.,* 176 F.R.D. 269, 272 (N.D.Ill.1997); *Pippenger v. Gruppe,* 883 F.Supp. 1201, 1204 (S.D.Ind. 1994); *Paramount Communications, Inc. v. Donaghy,* 858 F.Supp. 391, 395 (S.D.N.Y. 1994); *Allen v. West Point–Pepperell Inc.,* 848 F.Supp. 423, 428–29 (S.D.N.Y.1994); *Standard Chartered Bank PLC v. Ayala Intern. Holdings (U.S.) Inc.,* 111 F.R.D. 76, 80 (S.D.N.Y.1986); *Frank W. Schaefer, Inc. v. C. Garfield Mitchell Agency, Inc.,* 82 Ohio App.3d 322, 612 N.E.2d 442, 447–49 (1992); *Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 163 (Tex.1993). The *Hearn* approach best describes the trial court's sweeping decision in this case regarding Plaintiffs' alleged waiver.

{19} The majority view, however, has been applied in a confusing and uneven manner, leading to considerable criticism. *See West Point–Pepperell,* 848 F.Supp. at 429 ("Expansive interpretation of 'at issue' waiver under *Hearn* and its progeny has recently been the subject of significant legal and academic criticism."). Perhaps the strongest academic criticism is found in *Developments in the Law—Privileged Communications,* 98 Harv. L.Rev. 1450, 1639–43 (1985), claiming that only the third prong of the *Hearn* test— that the information be vital—has any limiting force on waiver. The law review strongly proposes that the opposing party's need for the information is anathema to the concept of an absolute privilege. The article is also critical because *Hearn* 's case-by-case balancing approach runs counter to the United States Supreme Court's emphasis on the need for certainty. *Id.*

{20} We consider noteworthy the following summation of criticism in the article: "the faults in the *Hearn* approach are (1) that it does not succeed in targeting a type of unfairness that is distinguishable from the unavoidable unfairness generated by every assertion of privilege and (2) that its application cannot be limited." *Id.; see also* Richard L. Marcus, *The Perils of Privilege: Waiver and the Litigator,* 84 Mich. L.Rev. 1605, 1632–33 (1986) (waiver should only be recognized where party has attempted to garble the truth by injecting privileged material itself into the case).

{21} Commentators and academicians are not alone in their criticism of *Hearn.* We deem especially persuasive the following discussion in *Rhone–Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851, 864 (3d Cir.1994):

Some decisions have extended the finding of a waiver of the privilege to cases in which the client's state of mind may be in issue in the litigation. These courts have allowed the opposing party discovery of confidential attorney client communications in order to test the client's contentions. *See, e.g., Byers v. Burleson,* 100

F.R.D. 436 (D.D.C.1983); *Hearn v. Rhay*, 68 F.R.D. 574 (E.D.Wash.1975). These decisions are of dubious validity. While the opinions dress up their analysis with a checklist of factors, they appear to rest on a conclusion that the information sought is relevant and should in fairness be disclosed. Relevance is not the standard for determining whether or not evidence should be protected from disclosure as privileged, and that remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue. As the attorney client privilege is intended to assure a client that he or she can consult with counsel in confidence, finding that confidentiality may be waived depending on the relevance of the communication completely undermines the interest to be served. Clients will face the greatest risk of disclosure for what may be the most important matters. Furthermore, because the definition of what may be relevant and discoverable from those consultations may depend on the facts and circumstances of as yet unfiled litigation, the client will have no sense of whether the communication may be relevant to some future issue, and will have no sense of certainty or assurance that the communication will remain confidential.

A party does not lose the privilege to protect attorney client communications from disclosure in discovery when his or her state of mind is put in issue in the action. While the attorney's advice may be relevant to the matters in issue, the privilege applies as the interests it is intended to protect are still served by confidentiality.

*Id.;* see also Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 413 (D.Del. 1992) (acknowledging academic criticism for the "[e]xpansive applications of implied waivers" and concluding that the "core problem, according to this line of reasoning, is that expansive language for determining implied waiver leads to a type of ad hoc determination that ignores the system-wide role of the attorney-client privilege and undermines any confidence the parties can place in the privilege").

▄ {22} We agree with the reservations forcefully discussed in *Rhone*. It follows from the rationale found in *Rhone* and the academic criticism of the *Hearn* approach that the third approach discussed by the Tenth Circuit in *Frontier Refining* merits serious consideration. That approach is to recognize waiver only where a party "seeks to limit its liability by describing that advice and by asserting that he relied on that advice." *Rhone* 32 F.3d at 863. The *Rhone* approach, which also recognizes waiver where direct use is anticipated because the holder of the privilege must use the materials at some point in order to prevail, is followed by a minority of courts. *See, e.g., Harter v. University of Indianapolis*, 5 F.Supp.2d 657, 664–65 (S.D.Ind.1998); *Dixie Mill Supply Co. v. Continental Cas. Co.*, 168 F.R.D. 554, 559 (E.D.La.1996); *Aranson v. Schroeder*, 140 N.H. 359, 671 A.2d 1023, 1030 (1995); *Pittston Co. v. Allianz Ins. Co.*, 143 F.R.D. 66, 71 (D.N.J.1992); *State v. Hydrite Chem. Co.*, 220 Wis.2d 51, 582 N.W.2d 411, 417–18 (Wis.Ct.App.1998).

{23} We believe the *Rhone* approach best fits New Mexico law. We therefore side with the minority of jurisdictions that require offensive or direct use of privileged materials before the party will be deemed to have waived its attorney-client privileges. In light of New Mexico's rule-bound law of privilege and the absence of Supreme Court case law to the contrary, which we discuss in the next section of our discussion, we believe the issue of waiver should be governed by, and limited to, Rule 11–511 (waiver of privilege by voluntary disclosure), in the absence of any other provision specifically addressing the issue. Our rules reflect a careful, methodical, approach to the development of the rules governing privileges—one that involves public participation and discourages ad hoc judicial intervention. On the other hand, application of the *Hearn*-type test would undermine the "full and frank" communications at the heart of the attorney-client privilege and would be contrary to the certainty that the rules themselves are intended to provide. Without such stability concerning to the privilege, how could an attorney and a client be able to predict, years later, whether their communi-

cations—intended to remain privileged— might be deemed by a later court to be "relevant" or "vital" regarding subsequent litigation. We believe the *Hearn* approach places this venerable privilege in harm's way, something we cannot countenance, and even at the expense of a zealous pursuit of truth. Any development or change in this area should be directed to our Supreme Court, our state's rule-making authority. We thus consider the *Rhone* approach to be based on sound principles and adopt it as law in New Mexico.

{24} The restrictive approach we adopt is consistent with the long-held view that the attorney-client privilege should act as a shield and not a sword. *See Weinstein's Federal Evidence* § 503.41[1]. Confusion in the "at-issue" case law arises because some courts believe that parties are using a privilege as a sword when they refuse to disclose matters relevant to issues or claims that they have injected into the litigation. This belief explains why the *Hearn* ad hoc balancing test has resulted in an expansive view of waiver. By adopting the *Rhone* approach requiring offensive or direct use of privileged information, we believe the "shield/sword" metaphor is more accurately applied.

{25} The *Rhone* approach is also more consistent with the purpose of the attorney-client privilege, which, as we already noted, "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also Swidler & Berlin v. United States,* 524 U.S. 399, 407, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) (holding that attorney-client privilege continues after death and noting that the Independent Counsel failed its significant burden to show that the full and frank communication policy at the heart of the privilege would not be undermined). Likewise, Defendants here have failed to show that the specter of a case-by-case judicial ad hoc application of the *Hearn* test would not undermine the purpose of the privilege.

{26} We are also unpersuaded by Defendants' arguments that New Mexico case law supports our adoption of the majority view represented by *Hearn.* As noted in the following section, in examining New Mexico case law, we are persuaded that it is not contrary to, but instead supports our holding.

**D. New Mexico Case Law Supports Adoption of the *Rhone* Approach**

**1. *Skaggs v. Conoco, Inc.***

{27} Both sides in this appeal rely on *Skaggs v. Conoco, Inc.,* 1998–NMCA–061, ¶ 21, 125 N.M. 97, 957 P.2d 526, as support for their respective arguments. In *Skaggs,* however, this Court did not consider it necessary to review the at-issue waiver in great depth. The plaintiffs in that case argued that, by raising the defense of laches, the defendants had waived their attorney-client privilege concerning certain title opinions received from counsel. *Id.* ¶¶ 20–21. Presumably, the plaintiffs were attempting to show that the defendants were on notice that the plaintiffs had an interest to the mineral rights in question. *See id.* ¶ 14 (discussing elements of laches). This Court concluded, however, that "[u]nder the facts presented here, we fail to see how the defense of laches implicates the title opinions sought by Plaintiffs since Defendants have not been shown to have relied upon those opinions to prove their defense of laches." *Id.* ¶ 21.

{28} Despite this quoted language, which we suggest indicates a preference for the more restrictive *Rhone* approach, Defendants note *Skaggs'* citation to *Conkling v. Turner,* 883 F.2d 431, 434 (5th Cir.1989) and that opinion's reliance on *Hearn.* Defendants argue that the reference to *Hearn* is an implicit adoption of that approach. We disagree with this reading of *Skaggs* for two reasons. First, *Hearn* was a fact-intensive test, and *Skaggs* did not suggest either that the trial court engaged in such analysis or that the *Hearn* approach would preclude waiver as a matter of law. In fact, the court in *Skaggs* appears to have noted *Conkling* only because it was the principal case relied on by the [p]laintiffs. *Skaggs,* 1998–NMCA–061, ¶ 21, 125 N.M. 97, 957 P.2d 526. Second, and this point reflects the confusion among many of

the at-issue cases, the facts of *Conkling* actually involved the type of partial use of privileged matters that would have triggered waiver under even the most restrictive approach. *See Conkling*, 883 F.2d at 432–33 (noting that Conkling, as plaintiff, had attempted to defeat the statute of limitations by submitting his own affidavit explaining privileged communications with a former attorney). Consequently, despite *Skaggs'* reference to *Conkling* and *Hearn*, we believe a preference for the more restrictive approach under *Rhone* was instead suggested by *Skaggs'* reliance on the following language in Restatement (Third) of the Law Governing Lawyers § 130 cmt. c, at 231 (Tentative Draft No. 2, 1989):

> Whether an adversary may obtain discovery of materials that otherwise are privileged depends not merely upon what the client pleads but upon the way in which the client will likely prove the assertion. If, for example, the client proposes to prove the allegation [or defense] in ways that do not involve any privileged communication, the exception does not apply.

*Skaggs*, 1998–NMCA–061, ¶ 21, 125 N.M. 97, 957 P.2d 526 (internal quotation marks omitted).

{29} A preference for a more restrictive approach is also implicit in *Skaggs'* reference to waiver requiring "offensive use" of privileged materials. *Id.* We recognize, of course, that the trial court in this appeal may have been misled by this Court's citation in *Skaggs* to *Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 590 (Tex.App.1994), which in turn follows its "offensive use" reference with an application of the *Hearn* test. Based on our review of cases from other jurisdictions, however, it appears that courts simply define "offensive use" differently. "Offensive use" under *Hearn* was deemed to be implicit from the parties' actions, whereas the restrictive approach requires direct use. Even under the *Hearn* approach, there is considerable room for courts to come to different conclusions on the waiver issue. *Cf. Paramount Communications*, 858 F.Supp. at 395–97 (discussing various distinctions that have emerged in the Second Circuit).

## 2. *Hartman v. El Paso Natural Gas Co.*

{30} As we previously noted, *Hearn* was based on the court's search for fairness and truth, two goals adopted by our Supreme Court in its discussion of privileges in *Hartman v. El Paso Natural Gas Co.*, 107 N.M. 679, 687, 763 P.2d 1144, 1152 (1988). Defendants point to court decisions quoted in *Hartman* that suggest a narrow construction of the attorney-client privilege and that waiver analysis be done on a case-by-case basis, such as Defendants advocate here under the *Hearn* approach. *Hartman*, however, involved inadvertent disclosure of privileged documents and whether that constituted a waiver of privilege. Its holding is confined to waiver as a function of prior disclosure. *Hartman* did not concern itself with new forms of waiver generally, or the at-issue waiver specifically, and therefore, taken in context, *Hartman* is of little help to our analysis. Because of the debate and confusion that has developed on the question of when privileged matters have been placed at issue, the significant criticism of *Hearn*, and the fact that our Supreme Court in *Hartman* did not specifically or expressly address the issue, we conclude that *Hartman* does not support adoption of the *Hearn* approach.

## E. Application of the *Rhone* Approach to this Appeal

{31} In light of our holding that waiver of the attorney-client privilege is governed exclusively by Rule 11–511 and its restriction to waiver by voluntary disclosure, the disposition of this appeal becomes straightforward. The trial court's order clearly reflects application of the *Hearn* approach, including specific determinations that materials relevant and vital to the equitable estoppel, equitable tolling, and fraudulent concealment claims should be disclosed. Because we reject the *Hearn* approach, we reverse the trial court for its reliance on that approach. We remand for the trial court's reconsideration of the issue under the *Rhone* approach, which we have adopted in this opinion.

{32} The trial court applied its waiver analysis to all relevant documents claimed to be protected by attorney-client privilege or the work product doctrine. Our holding is

therefore limited to the "at-issue" waiver theory, and we point out that neither this Court nor the trial court has addressed claims that are unique to work product protection under Rule 1–026. *Cf. Hartman*, 123 N.M. 220, 937 P.2d 979, 1997–NMCA–032, ¶¶ 18–25 (discussing work product discovery issues and noting that work product is distinct from issues governing privileges).

## III. CONCLUSION

{33} For these reasons, we reverse the trial court and remand for proceedings consistent with this opinion. The parties shall bear their respective costs on appeal.

{34} **IT IS SO ORDERED.**

BOSSON and ARMIJO, JJ., concur.